Deborah Alderson WILKINSON,
Appellant–Plaintiff,

v.

Robert SWAFFORD, Appellee–
Defendant.

No. 49A05–0310–CV–517.

Court of Appeals of Indiana.

June 29, 2004.

376

Lance Wittry, Wittry & Wittry, Cheryl Planck, Indianapolis, IN, Attorneys for Appellant.

Karl G. Popowics, Bradley J. Schulz, Goodin Abernathy & Miller, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In January 1999, Deborah Alderson Wilkinson[1] filed her Complaint for Damages

---

1. At trial, when asked to state her name, Wilkinson stated, "My name is Deborah Wilkinson Alderson." However, all of the pleadings and the Chronological Case Summary ("CCS") refer to her as "Deborah Alderson Wilkinson." We refer to her as "Wilkinson."

against Robert Swafford alleging, in relevant part, that Swafford had negligently operated his vehicle when it collided with her vehicle, causing her personal injuries. Following trial, a jury found Wilkinson 45% at fault and awarded her $124,520 in total damages. The trial court entered judgment against Swafford, and Wilkinson filed a motion to correct error, which the court denied. Wilkinson now appeals, and Swafford cross-appeals. Together, the parties present the following issues for review:

1. Whether the trial court abused its discretion when it instructed the jury on Swafford's affirmative defense of failure to mitigate damages.

2. Whether the trial court abused its discretion when it admitted into evidence a summary of Wilkinson's medical expenses.

3. Whether the trial court abused its discretion when it admitted certain photographs of Wilkinson's vehicle following the accident.

4. Whether the trial court abused its discretion when it excluded a report prepared by a physician who had examined Wilkinson but who did not testify at trial.

We affirm in part, and remand in part with instructions.

## FACTS AND PROCEDURAL HISTORY

On January 26, 1997, Swafford and Wilkinson were driving their respective vehicles in Indianapolis when the vehicles collided. After the accident, Wilkinson sought and received medical treatment over a period of years from Dr. John Cummings, Dr. Rick Sasso, and Dr. David Steiman. All three physicians treated Wilkinson for a herniated disk in her cervical spine.

On January 25, 1999, Wilkinson filed suit against Swafford. Swafford filed his Answer in February 1999. In July 2002, Swafford amended his answer to admit liability for the accident. Then in December 2002, Swafford moved to amend his answer a second time to add the affirmative defense of failure to mitigate damages. Wilkinson objected to the motion and argued in relevant part that discovery had been completed, that the relevant physicians had already been deposed, and that because the affirmative defense had not been filed, she did not question those physicians about failure to mitigate. In sum, she argued that Swafford's motion to amend his answer to add the affirmative defense was untimely and would prejudice her. The trial court did not rule on Swafford's second motion to amend until July 17, 2003, when it granted Swafford's motion.

On August 21, 2003, five days before trial, Wilkinson moved to strike Swafford's affirmative defense and argued that he had produced no testimony to establish that Wilkinson's actions had aggravated or increased her injuries. Swafford responded that Wilkinson's motion to strike was, in essence, a motion for judgment on the evidence under Indiana Trial Rule 50 and was premature. Then, on the first day of trial, August 26, counsel for both parties argued their respective positions regarding Wilkinson's motion to strike. Wilkinson's counsel explained that none of the three treating physicians who had been deposed would testify in person at trial. Rather, all of the medical testimony would be presented to the jury by way of deposition. Based on Wilkinson's review of those depositions, she alleged that there was no evidence to support Swafford's mitigation of damages defense and asked that the court strike that defense. Swafford, again, responded that Wilkinson's argument was

premature. The court denied Wilkinson's motion to strike.

Before trial, Wilkinson had also moved to strike Exhibit A to the deposition of Dr. Sasso, which was a report prepared by another physician, Dr. Michael Berkowitz. After argument from counsel, the trial court granted Wilkinson's motion to strike the report and any deposition testimony from Dr. Sasso regarding that report. During trial, the court admitted into evidence, over Swafford's objections: (1) a photograph of Wilkinson's vehicle while it was being repaired; and (2) a summary of Wilkinson's medical expenses.

In support of her claim for lost wages, Wilkinson presented the deposition testimony of Larry Grabb, Ph.D. Dr. Grabb calculated, among other things, Wilkinson's projected earned income through 2002, assuming she had not been injured in the accident. Dr. Grabb determined that her projected earned income was $173,240.62, and then subtracted the income Wilkinson actually earned, which was $20,211.12. Accordingly, Wilkinson claimed approximately $150,000 in lost wages from 1997 through 2002.

During cross-examination, Wilkinson testified that she received a letter from Federal Express ("Fed Ex") in January 1998 regarding her permanent work restrictions in which ("Fed Ex") gave her the option to seek a different position within ninety days or face termination. Wilkinson stated that she voluntarily left employment at Fed Ex and did not seek other work there because her doctors had imposed a seventy-five-pound lifting restric-

tion on her work. After she left Fed Ex, she worked on commission with an entertainment organization. She also stated that she had had one job offer but she did not accept it because of work restrictions imposed by her doctors. She admitted that she had not worked at all during 2003. From 1991 through 1996, Wilkinson earned a total of $124,806.96. For the years 1997 through 2002, she earned $20,211.12.[2]

On August 28, the last day of trial, Wilkinson filed a Request For Reconsideration Regarding Failure To Mitigate & Comparative Fault Instructions, And Jury Verdict Forms Tendered By The Defense. Wilkinson, again, argued that Swafford had presented no medical evidence to show that her actions or inactions had aggravated or increased her injuries and, as a result, the jury should not be instructed on mitigation of damages and comparative fault. Later that day, when counsel and the trial court discussed final jury instructions, Wilkinson raised those same arguments. Swafford responded that certain portions of each physician's deposition testimony supported his affirmative defense. In addition, he asserted that there was evidence that Wilkinson had unreasonably failed to find work to replace her pre-accident income.[3]

The trial court determined that there was "enough [evidence] there to go forward" with Swafford's affirmative defense and that it would let the jury decide "whether there was or was not a failure to mitigate." The court then instructed the

---

**2.** Again, the accident occurred in January 1997.

**3.** In support of his "underemployment" argument, Swafford relied on this court's opinion in *Kocher v. Getz*, 787 N.E.2d 418 (Ind.Ct. App.2003), which involved a failure to mitigate damages defense where there was evi-

dence that the plaintiff had failed to replace certain income following an accident. Swafford acknowledges in his brief that, after trial in this case, our supreme court granted transfer in *Kocher* and has not yet issued an opinion. *See Kocher v. Getz*, 804 N.E.2d 760 (Ind.2003).

jury on Swafford's affirmative defense and comparative fault and gave the jury a verdict form consistent with comparative fault. The jury found in Wilkinson's favor and determined that her damages were $226,400. But the jury also found Wilkinson 45% at fault,[4] reduced her damage award accordingly, and awarded her $124,520 in total damages.

On September 2, 2003, Wilkinson filed her Motion to Correct Error and, again, argued that there was no evidence to support Swafford's affirmative defense. The trial court denied that motion, and this appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Failure to Mitigate Damages

Wilkinson maintains that Swafford failed to present evidence in support of his affirmative defense and, accordingly, that the trial court erred when it instructed the jury on the defense and gave them a verdict form that allowed them to apportion fault to her based on that defense. Swafford responds that Wilkinson has waived her arguments regarding his affirmative defense and, alternatively, that he presented sufficient evidence to support the giving of the mitigation of damages and comparative fault instructions.

Initially, Wilkinson's Statement of the Issues contains three issues, all of which relate to the trial court's decision to allow Swafford to present his affirmative defense of failure to mitigate damages at trial. Specifically, she identifies the following issues on appeal: (1) whether the affirmative defense of failure to mitigate damages should have been withdrawn from the jury's consideration, and whether the jury should have been instructed on failure to mitigate damages; (2) whether the verdict form inappropriately allowed the jury to assess fault against Wilkinson on the basis of her failure to mitigate; and (3) whether the jury's finding of 45% fault against Wilkinson, based solely on Swafford's failure to mitigate defense, was supported by the evidence at trial where Swafford admitted liability. But Wilkinson did not present separate argument for each of those issues. Instead, following her Summary of the Argument, her Appellant's Brief contains a section entitled "Legal Analysis," in which she discusses relevant case law. Thereafter, in her Argument section, she discusses only the lack of evidence to support Swafford's affirmative defense. While she provided proper citations to her Appellant's Appendix, she provided no citations to authority in her Argument. Swafford asserts that as a result of Wilkinson's failure to follow the appellate rules, she has waived her arguments on appeal.

We do not approve of Wilkinson's failure to provide proper legal citation throughout her Argument. *See* Ind. Appellate Rule 46(A)(8)(a) (stating each contention must be supported by citations to authorities, statutes, and the Appendix or parts of the Record on Appeal relied on). However, we are able, as Swafford was able, to ascertain her arguments with reference to the cases cited in the "Legal Analysis" section of her Appellant's Brief. Further, Indiana Appellate Rule 46(A)(8)(c) provides: "Each argument shall have an argument heading. *If substantially the same issue is raised by more than one asserted error, they may be grouped and supported by one argument.*" (Emphasis added). Here, Wilkinson's argument, in essence, is that because Swafford presented no evi-

---

4. The verdict form did not require the jury to identify the basis upon which it attributed Wilkinson fault.

dence to support his affirmative defense of failure to mitigate damages, the trial court erred when it instructed the jury on his defense. Indeed, the parties agreed during a bench conference with the trial court that without evidence to support the mitigation of damages defense, it would be unnecessary for the court to instruct the jury on mitigation of damages or comparative fault, or to provide the jury with a verdict form that permitted it to allocate fault to Wilkinson. Accordingly, although we reject Swafford's waiver argument, we agree with his contention that the applicable standard of review is whether the trial court erred when it instructed the jury on mitigation of damages and comparative fault.

■ As with the trial court's refusal to give an instruction, a claim of error based on the giving of an instruction is reviewed for an abuse of discretion. *Aldana v. School City of East Chicago*, 769 N.E.2d 1201, 1209 (Ind.Ct.App.2002), *trans. denied.* An instruction given to the jury must be a correct statement of the law, be applicable to the evidence adduced at trial, and be relevant to the issues the

jury must decide in reaching its verdict. *Id.* Errors in jury instructions are harmless and do not require reversal where the verdict would have been no different had the jury been properly instructed. *See Sikora v. Fromm*, 782 N.E.2d 355, 361 (Ind.Ct.App.2002), *trans. denied.*

■ Each party to an action is entitled to have the jury instructed upon his particular theory of the case. *Aldana*, 769 N.E.2d at 1210. Here, Swafford admitted liability for the accident, and his only asserted affirmative defense was that Wilkinson had failed to mitigate her damages. But Wilkinson contends that the evidence at trial was insufficient to support the giving of the mitigation of damages and comparative fault instructions. In particular, she claims that: (1) there is no medical testimony from any of the treating physicians to establish that her actions either aggravated or increased her injuries; and (2) Swafford's contention that she unreasonably failed to replace lost income is misplaced in light of the expert testimony she presented to support her lost wages claim. We address those arguments in turn.[5]

---

5. Although Wilkinson does not set forth the relevant instructions in her Appellant's Brief, *see* Ind.App. R 46(A)(8)(e) (providing where error is predicated on giving or refusing of any instruction, Appellant shall set out instruction verbatim in argument section), she did provide the instructions in her Appendix. The trial court instructed the jury in relevant part as follows:

The Defendant has the burden of proving the following proposition by a preponderance of the evidence:

1. That the Plaintiff failed to properly mitigate her damages.

The Plaintiff has a duty to minimize her damages by following the expert recommendations of her physicians. In other words, a person who has suffered injury by reason of a defendant's negligence is bound to use reasonable and proper effort to make the damages as small as practicable, and to act in good faith to adopt reasonable meth-

ods and follow reasonable programs of medical care or treatment to restore herself. The Defendant must prove the Plaintiff has unreasonably failed to mitigate her damages by a preponderance of the evidence.

If you find from a preponderance of the evidence that the Plaintiff ... failed to make a reasonable effort to minimize her damages, then such conduct would constitute fault to be assessed against the Plaintiff.

Although Wilkinson does not challenge the instruction on such grounds, we note that the trial court's instruction correctly states the law. *See Sikora* 782 N.E.2d at 362 (stating following instruction was correct statement of law: "The Plaintiff has a duty to exercise reasonable care to mitigate any damages he may have suffered in the accident. The failure to obey [his] physician's instructions which exacerbated or aggravated [his] inju-

## A. Medical Testimony

■■■ As this court explained in *Kristoff v. Glasson*, 778 N.E.2d 465, 474 (Ind. Ct.App.2002):

> A plaintiff who has been awarded a judgment for injuries negligently inflicted by a defendant can have the amount of compensatory damages proportionately reduced by the amount of her contributory fault. For example, mitigation of damages is a defense available to defendants after having been found negligent. *This defense addresses the conduct of the injured party that aggravates or increases the party's injuries.* Generally, the non-liable party must mitigate its damages, but the burden lies with the liable party to prove that the non-liable party has not used reasonable diligence to mitigate its damages.

(Emphasis added, citations and quotations omitted). In that case, the defendant argued at trial that the plaintiff had failed to mitigate her damages, in part, because she had failed to complete her home exercise program. *Id.* Specifically, one of the plaintiff's treating physicians had testified that she did not regularly perform her prescribed exercises. *Id.* However, the testimony of three other physicians showed that the plaintiff had sustained "multiple complex injuries," and none of those physicians testified that she had failed to mitigate her damages. *Id.* In addition, according to the trial court, the physician who had stated that the plaintiff had failed to complete her exercise program also testified that she "had not done anything or failed to do anything to worsen her condition." *Id.*

In analyzing whether there was sufficient evidence to support the jury's determination that the plaintiff had unreasonably failed to mitigate her damages, we stated that "[t]he mitigation of damages claim went to the issue of medical causation and, as such, required medical expert testimony." *Id.* at 475 (citing *Daub v. Daub*, 629 N.E.2d 873 (Ind.Ct.App.1994), *trans. denied*). And because none of the physicians at trial testified that the plaintiff's failure to complete her exercise program had aggravated or increased her injuries, we agreed with the trial court's determination that the defendant had failed to present sufficient evidence to support his mitigation of damages claim in that regard. *Id.* at 474–75.

Similarly, in *Sikora*, 782 N.E.2d at 362, we addressed a defendant's claim that he had presented sufficient evidence to support the giving of a mitigation of damages instruction at trial.[6] But the only medical testimony the defendant referenced in support of the giving of the instruction was a treating chiropractor's statements that it is important for patients to follow up with treatment and that the plaintiff had rescheduled and missed several appointments. *Id.* We affirmed the trial court's conclusion that that evidence did not support the giving of the mitigation of damages instruction because the testimony did "not support the inference that [the plaintiff's] actions, or inactions, *aggravated or increased* his injuries." *Id.* (emphasis original).

■■■ In this case, before, during, and after trial, Wilkinson repeatedly alleged that none of the treating physicians' testimony established that her conduct had

---

ries constitute[s] fault."). The trial court also instructed the jury regarding comparative fault, and Wilkinson does not challenge that instruction as an incorrect statement of the law.

**6.** The text of the instruction at issue in *Sikora* appears in footnote 5 of this opinion.

aggravated or increased her injuries.[7] In response, Swafford directs us in part to the following testimony of Dr. Cummings:

Q. Doctor, returning you to your March 24 of 1997 letter. At the conclusion of your letter, you asked to follow up with the plaintiff in approximately six weeks, did you not?

A. Yes.

Q. You requested that because in your opinion that would be medically beneficial to the plaintiff, correct?

A. Probably was going to follow up on how the medications that I prescribed were of any value and see if she was continuing to improve having been through physical therapy and was still hurting.

Q. And, again, that would be of medical benefit to her, in your opinion, correct?

A. I though that would be a benefit.

Q. In fact, the next time you saw the plaintiff was June 25 of 1997; isn't that right?

A. Yes.

Q. That's not six weeks after March 24, 1997, is it?

A. No.

Dr. Cummings testified further that after her March 1997 appointment, Wilkinson did not see him again until June 2001. Swafford also points to testimony that, at that time, Dr. Cummings recommended that Wilkinson have surgery to relieve her pain. In particular, Swafford directs us to the following testimony:

Q. Your August 20, 2001 note, Doctor, it says on the third full paragraph—

could you read that first sentence for me, please?

* * *

A. [Reading from exhibit] "She has a fairly busy work schedule between now and the beginning of October, so I told her to contact my office with the date when she would be available. The risk [and] benefits of surgery were again discussed and documented previously and will not be repeated now."

Q. And at this point, we're still in a return as needed or essentially you haven't given her a date to come back? It's basically up to the plaintiff to make contact with your office, correct?

A. She is absolutely terrified of having her neck operated on and is dragging her feet and putting her head in the sand as long as she humanly can.

Q. I guess the question was: It's still— you haven't set a date specific to return to your office, have you?

A. No.

Swafford also directs us to testimony of Dr. Sasso, who explained that in September 1998, he had diagnosed Wilkinson with a possible herniated disk. Dr. Sasso recommended that Wilkinson have a nerve root block performed to determine the etiology of her pain. Dr. Sasso does not perform nerve root blocks, but he asked Wilkinson to follow up with him. She saw Dr. Sasso again in December 1998 and had not had the nerve root block performed. He stated that Wilkinson "gave a number of reasons" for not having had the procedure, but he could not recall the reasons.

7. Again, the parties deposed three doctors during discovery, and portions of those depositions were read into the record at trial.

Accordingly, there was no live testimony from any of the doctors at trial.

In addition, the following colloquy occurred during Dr. Sasso's testimony:

Q. [Plaintiff's counsel] stated that throughout your treatment, you're essentially trying to get the plaintiff better. Does that include the request that the plaintiff undergo a nerve root block in order to determine what the main pain generator is?

A. It may.

Additionally, Swafford directs us to the testimony of Dr. Steiman, a neurosurgeon who examined Wilkinson in the summer of 1998. At that time, Wilkinson had already seen Dr. Cummings, and her family doctor had referred her to Dr. Steiman. Dr. Steiman saw Wilkinson one time and performed various diagnostic tests, including a motor exam. He described that test as follows:

Q. Doctor, I also note that you administered, I believe, what's called a motor exam.

A. That is correct.

Q. Could you briefly explain what's involved in this type of motor exam that you administered to the plaintiff?

A. Basically what you're doing as part of your neurological assessment is test the strength of a patient. And so what you do is go through certain muscle groups, depending on if you're looking at a neck or low[er] back or whatever. And in looking at her neck, I was testing her upper extremities in terms of the strength.

Q. And how did you do that?

A. Well, in this case, I isolated the muscles themselves. For example, if I do a hand grip, I'll give the patient my two fingers in each hand and tell them to squeeze it. If I'm going to test their biceps, I'll have them lie down on a table, put their elbows on the table, bend their hands up 90 degrees so I'm isolating just their biceps. In this case, I'll pull down and have the patient pull up as hard as they can against me generating force against my pull. If I [were], for example, testing the triceps, the muscles in the back of the arm, I'd do it the opposite way. So what I'm doing is I'm isolating muscle groups to try to test that one muscle.

Q. And what type of exercise did you put the plaintiff through here?

A. Well, I tried to test her muscle strength in her upper extremities and basically did what I was just reading into—I just did what I just talked to you about reading on the record, yeah.

Q. And what were the results of that motor exam?

A. Well, the best I could say is I thought they were very inconclusive.

Q. And why did you think they were inconclusive?

A. Because I didn't think this patient was trying.

Q. How could you tell this patient wasn't trying?

A. .... This is what I do. This is all I do all day long when I'm in the office, examining people frequently for this. And I just knew this patient simply wasn't trying. Now, there is a difference between weakness and weakness from pain and then from not trying. I can only say in looking at this that my impression at this point when this patient was examined is this patient simply wasn't, what we say, compliant with the exam.

Q. She wasn't trying?

A. Correct.

When asked whether he had formed an opinion regarding why Wilkinson was not trying, Dr. Steiman stated:

A. My opinion at that time is that a lot of people have—let me rephrase that. I don't want to take liberties. I'm trying to give my testimony as best as I can tell you. It's simply that some people don't want to get better for a variety of reasons. Some people will come in and think that the more problems I have, the better it is for them. I can't tell you why this was done. I could simply state medically that it was done.

Q. You mean the lack of effort?

A. The lack of effort. . . .

In her Reply Brief, Wilkinson goes to great lengths to direct us to other portions of the doctors' depositions that contradict and/or explain specific statements Swafford relies on in support of his affirmative defense. But we need not address that evidence because none of the testimony set forth above, when viewed separately or together, supports a reasonable inference that Wilkinson's actions, or inactions, aggravated or increased her injuries. *See Sikora*, 782 N.E.2d at 362. Indeed, Dr. Cummings and Dr. Sasso's testimony is similar to the evidence at issue in both *Sikora* and *Kristoff*, where testimony established only that the plaintiffs failed to follow their doctor's treatment orders. In particular, while Dr. Cummings stated that he thought that Wilkinson would benefit from a follow-up, nothing in his testimony suggests that her failure to follow up aggravated or increased her injuries. Dr.

Sasso's testimony established only that Wilkinson did not follow his recommendation that she have a diagnostic nerve root block performed. And while Dr. Steiman's testimony supports an inference that Wilkinson was uncooperative during a diagnostic exam, Swafford directs us to no evidence that Wilkinson's failure to cooperate during a motor exam aggravated or increased her injuries.·

Again, Swafford's mitigation of damages claim regarding Wilkinson's medical care goes to the issue of medical causation. *See Kristoff*, 778 N.E.2d at 475. Accordingly, to support his mitigation of damages defense, Swafford was required to produce some medical testimony that Wilkinson's actions, or inactions, aggravated or increased her injuries. *See id.* at 474.[8] Our review of the testimony on which Swafford relies in support of his defense falls short of that requirement because none of the doctors testified that Wilkinson's conduct, i.e., her failure to follow up in a timely manner, her decision not to have surgery, her decision not to have a nerve root block, and her lack of cooperation during a diagnostic exam, aggravated or increased her injuries. Therefore, we agree with Wilkinson that Swafford failed to present evidence to support his mitigation of damages defense as it relates to her medical care.

**B. Failure to Replace Lost Income**

■ Still, Swafford asserts that his mitigation of damages defense is supported by a separate mitigation theory, namely, that Wilkinson unreasonably failed to replace income she had earned prior to the accident. In support, Swafford directs us, in part, to evidence that: (1) Wilkinson voluntarily left her employment at Fed Ex

---

8. Swafford also directs us to certain portions of Wilkinson's testimony to support his claim that she failed to mitigate her damages regarding her medical treatment. But Wilkinson, who is not a doctor, did not provide expert medical opinions. Thus, her testimony, by itself, could not establish that her actions or inactions aggravated or increased her injuries. *See Daub*, 629 N.E.2d 873, 877–78.

without seeking an alternative position; (2) Wilkinson earned only $20,211.12 in wages in the six years following the accident, compared to the $124,806.96 in wages she earned in the six years before the accident; (3) although she is able to work with restrictions, Wilkinson had not worked at all in 2003. We agree that Swafford did present evidence to support his mitigation of damages defense as that defense relates to Wilkinson's lost income.

However, we are unable to discern whether the jury determined that Wilkinson failed to mitigate her damages based on: (1) the evidence regarding her compliance with her medical treatment, and/or (2) the evidence regarding her alleged failure to replace lost income.[9] Our review of the record as a whole shows that the jury likely allocated fault to Wilkinson based on the medical testimony, which was insufficient as a matter of law to support Swafford's affirmative defense. To the extent that the trial court based its decision to instruct the jury on mitigation of damages and comparative fault on the medical testimony, that was error. See Kristoff, 778 N.E.2d at 474; see also Sikora, 782 N.E.2d at 362.

Swafford concedes that his mitigation of damages defense, as it relates to Wilkinson's alleged failure to replace lost income, is based on an opinion from this court that, since Swafford's trial, has been vacated. See Kocher v. Getz, 787 N.E.2d 418 (Ind. Ct.App.2003), trans. granted, 804 N.E.2d 760 (Ind.2003). The primary dispute in that case was whether a defendant who had admitted liability for an accident, but alleged that the plaintiff failed to mitigate her damages by failing to replace lost income, was entitled to have the jury instructed on comparative fault. Even though our supreme court granted transfer in that case, our opinion in Kocher was still good law at the time this case was tried. Accordingly, the trial court acted within its discretion to the extent that it instructed the jury on mitigation of damages and comparative fault based on Swafford's claim that Wilkinson had unreasonably failed to replace lost income.

Nevertheless, while there was evidence that Wilkinson unreasonably failed to replace lost income to support the trial court's decision to instruct the jury on mitigation of damages and comparative fault, we cannot determine on what basis the jury allocated fault to Wilkinson. As we have stated, because the trial court's mitigation of damages instruction only specifically addressed Wilkinson's medical treatment, it is likely that the jury relied upon the medical testimony to support that fault allocation.[10] Therefore, we are compelled to remand this case for a new trial for the limited purpose of determining contributory fault. Specifically, the jury shall determine whether and, if so, to what extent, Wilkinson failed to mitigate her damages by unreasonably failing to replace her pre-accident income.[11]

---

9. Our review of the relevant jury instructions shows that the trial court instructed the jury on mitigation of damages only as it related to Wilkinson's medical treatment, not her alleged failure to replace lost income. The parties did not provide us with a transcript of final arguments, so we cannot determine whether Swafford's counsel argued his failure to replace lost income theory to the jury.

10. Wilkinson does not argue that the jury could not have determined that she had failed to mitigate her damages based on her lost income because of that instruction.

11. Wilkinson did not argue that her alleged failure to replace lost income may not, as a matter of law, support a mitigation of damages defense. She does not address either our decision in Kocher or our supreme court's decision to grant transfer. Rather, her sole claim on appeal is that there is no evidence of her alleged failure to replace income to support the giving of the mitigation

On remand, the trial court shall instruct the jury that Wilkinson's total damages are $226,400. And the only evidence presented will concern her alleged failure to replace lost income. Indeed, whether Wilkinson failed to mitigate her damages based upon her alleged noncompliance with medical treatment will *not* be an issue at trial. Rather, the sole issue to be considered is whether she should be assessed any fault and, if so, how much fault due to her alleged unreasonable failure to replace pre-accident income.

### Issue Two: Summary of Medical Expenses

■■■■■ On cross-appeal, Swafford asserts that the trial court abused its discretion when it admitted, over his objection, Plaintiff's Exhibit 12, which is a summary of Wilkinson's medical expenses. A trial court has broad discretion in determining the propriety of admission of evidence. *Sikora*, 782 N.E.2d at 359. Reversal of the trial court's ruling is warranted only when the court has abused its discretion, and its action is clearly erroneous and against the facts and circumstances before it. *Id.* We will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

■■■■■ The admission of medical expenses into evidence is controlled by Indiana Rule of Evidence 413, which reads as follows:

Statements of charges for medical, hospital or other health care expenses for diagnosis or treatment occasioned by an injury are admissible into evidence.

Such statements shall constitute prima facie evidence that the charges are reasonable.

As our supreme court explained in *Cook v. Whitsell–Sherman*, 796 N.E.2d 271, 277 (Ind.2003):

In order to recover an award of damages for medical expenses, the party seeking to recover these damages must prove that the expenses were both reasonable and necessary. This was traditionally proven by expert testimony. *The purpose of Rule 413 is to provide a simpler method of proving the amount of medical expenses when there is no substantial issue that they are reasonable and were caused by the tort.* If there is a dispute, of course the party opposing them may offer evidence to the contrary, including expert testimony. By permitting medical bills to serve as prima facie proof that the expenses are reasonable, the rule eliminates the need for testimony in that often uncontested issue. *Finally, the fact that a statement was submitted is at least some evidence that the charge is normal for the treatment involved, and it was necessary to be performed.*

(Citations omitted, emphases added).

■■■■ Here, Swafford stipulated that Plaintiff's Exhibit 12 was a summary of Wilkinson's medical bills, which relieved Wilkinson of the burden of submitting each of her bills into evidence. On appeal, Swafford does not assert that Wilkinson was required to submit her medical bills in order for Plaintiff's Exhibit 12 to be admissible. Rather, he contends that the

---

of damages and comparative fault instructions. Regarding re-trial, we cannot predict what our supreme court will decide on the mitigation of damages issue in *Kocher*. But we are confident that that opinion will clarify whether, during the second trial, Swafford may properly raise a mitigation of damages defense based on his allegation that Wilkin-

son unreasonably failed to replace income. Our decision today determines only that Swafford presented evidence of Wilkinson's alleged unreasonable failure to replace income, but because we cannot know whether the jury allocated fault to Wilkinson on that basis, remand is necessary.

trial court should have excluded Plaintiff's Exhibit 12 because there was no evidence that the expenses contained in that summary related to treatment that was medically necessary. We cannot agree.[12]

■ Under *Cook*, Plaintiff's Exhibit 12 constitutes "some" evidence that the charge is normal for the treatment involved, i.e. reasonable, and that *the treatment was necessary to be performed. See id.* Indeed, *Cook* clarifies that, unless the opposing party presents evidence to dispute that medical treatment and the resulting expenses were made necessary by the accident, medical bills are admissible to show that the medical services performed were necessary. *See id.* Here, Swafford presented no evidence to dispute that the expenses listed in Plaintiff's Exhibit 12 were medically necessary, and Plaintiff's Exhibit 12 was admissible as proof of the necessity of the medical treatment provided.

In addition to Plaintiff's Exhibit 12, Dr. Cummings testified that, in his opinion, "the [January 1997] accident had a high likelihood of causing" Wilkinson's herniated disk. And Dr. Cummings testified that Plaintiff's Deposition Exhibit 4, a summary of medical treatment Wilkinson had undergone since the accident, accurately summarized Wilkinson's medical care. The only substantive difference between Plaintiff's Deposition Exhibit 4 and Plaintiff's Exhibit 12 is that Plaintiff's Deposition Exhibit 4 does not contain the amount charged for the services provided to Wilkinson. In any event, Dr. Cummings' testimony regarding that exhibit supports an inference that the medical treatment reflected there-

in was related to her injuries caused by the accident and, thus, was necessary. We conclude that the trial court did not abuse its discretion when it admitted Plaintiff's Exhibit 12.

### Issue Three: Photographs

■ Next, Swafford contends that the trial court abused its discretion when it admitted, over his objection, photographs that depicted Wilkinson's vehicle as it was being repaired. Admission of photographs into evidence is left to the sound discretion of the trial court, and we will not reverse that decision except for an abuse of that discretion. *State Through Highway Dept. v. Snyder*, 594 N.E.2d 783, 787 (Ind.1992). To admit a photograph into evidence, a trial court must first determine the photograph is relevant. *Custis v. State*, 793 N.E.2d 1220, 1224 (Ind.Ct.App.2003), *trans. denied.* Indiana Evidence Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence that is not relevant is not admissible. Ind. Evid. R. 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Ind. Evid. R. 403.

■ During re-direct examination, Wilkinson's attorney questioned her about the vehicle damage caused by the accident and sought to admit Plaintiff's Exhibit 21, a photograph of her vehicle while it was being repaired. Swafford had previously tendered a photograph of Wilkinson's vehi-

---

**12.** We disagree with Wilkinson's argument that Swafford waived his challenge to the admission of Plaintiff's Exhibit 12. Our review of the transcript shows that although Swafford's counsel agreed that Plaintiff's Exhibit 12 is a summary of Wilkinson's medical

bills, he made sure that that specific stipulation would not waive his objection on the ground that there was no evidence that those expenses stemmed from medically necessary services.

cle, but Wilkinson sought to admit Plaintiff's Exhibit 21 on grounds that it more accurately depicted the damage to her vehicle. Swafford's attorney objected on relevance grounds and argued that the photograph did not depict how her vehicle looked just after the accident. Rather, it depicted the vehicle with the hood raised and with certain portions of the vehicle removed for repair purposes. After argument from counsel, the trial court admitted the photograph over Swafford's objection.

We agree with Swafford that Plaintiff's Exhibit 21 has little, if any, relevance, because it does not reflect how Wilkinson's car looked after the accident. But even assuming that the photograph were not admissible, Swafford has not demonstrated that the court's decision to admit the photograph warrants reversal. Indiana Trial Rule 61 provides in relevant part: "No error in . . . the admission . . . of evidence . . . is ground for . . . reversal on appeal, unless refusal to take such action appears to the court inconsistent with substantial justice." Moreover, this court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *Id.*

Again, Swafford had already tendered a photograph that depicted Wilkinson's vehicle just after the accident when it was *not* in a state of repair. In addition, Wilkinson conceded that Plaintiff's Exhibit 21 did not depict how her vehicle looked immediately after the accident. Accordingly, we cannot conclude that Plaintiff's Exhibit 21 affected

Swafford's substantial rights, and the court's decision to admit the photograph was, at most, harmless error. *See* Ind. Trial R. 61.

### Issue Four: Dr. Berkowitz's Report

Swafford's final argument on cross-appeal is that the trial court abused its discretion when it granted Wilkinson's motion to strike Exhibit A to Dr. Sasso's deposition, in addition to Dr. Sasso's testimony concerning that exhibit. Prior to trial, Wilkinson moved to strike testimony wherein Dr. Sasso discussed a report prepared by one of his medical partners at the time, Dr. Michael Berkowitz. That report was identified as Exhibit A during Dr. Sasso's deposition. Swafford claims that the trial court should have admitted that report, and Dr. Sasso's testimony concerning it, because the report is a business record and excepted from the hearsay rule under Indiana Evidence Rule 803(6). Again, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Meyer v. Marine Builders, Inc.,* 797 N.E.2d 760, 767 (Ind.Ct.App. 2003). We will reverse such an exercise of discretion only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.*[13]

Hearsay is not admissible except as provided by law or by the Indiana Rules of Evidence. *See* Ind. Evid. R. 801. However, under Indiana Evidence Rule 803(6), records of regularly conducted business activity are not excluded by the hearsay

---

**13.** Wilkinson filed a Motion to Strike Portion of Appellee's Reply Brief on Cross–Appeal, alleging that Swafford had waived any argument that he was prejudiced by the exclusion of Dr. Berkowitz's report. Specifically, she asserts that because Swafford did not argue that the exclusion of the report prejudiced him in his primary Appellee's Brief on Cross–Appeal, he has waived the argument on appeal. We disagree. In his Appellee's Brief,

Swafford argued thoroughly that the report should have been admitted. In response, Wilkinson asserted that the report was properly excluded and that Swafford was not prejudiced by exclusion of the report. It was proper for Swafford to reply to Wilkinson's specific prejudice argument in his reply brief on cross-appeal. We therefore deny Wilkinson's motion to strike.

rule even though the declarant is available as a witness, and that rule provides:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the . . . report . . ., all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this Rule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Dr. Sasso testified regarding Dr. Berkowitz's report as follows:

Q. You had said that you referred the plaintiff to a physiatrist. Is that Dr. Berkowitz?

A. Yes.

Q. Do you have a note in your file, Doctor, from Dr. Berkowitz when [Wilkinson] was seen at Indianapolis Neurosurgical?

A. I believe I do.

Q. Is that on January 27, 1999?

A. Yes.

Q. At the point of January 27, 1999, had the plaintiff undergone a nerve root block?

[Plaintiff's Counsel:] I'm going to object to the question. Are you asking him to testify based upon a report of Dr. Berkowitz?

[Defendant's Counsel:] Well, let me ask some preliminary questions first, if I may.

Q. Doctor, it appears that this January 27, 1999 report was generated by Dr. Berkowitz?

A. Yes.

Q. Is Dr. Berkowitz a physician who's also with the Indianapolis Neurosurgical Group?

A. Yes.

Q. Why are reports like this generated?

A. They're generated in the normal practice of medicine.

Q. Are these generated after taking information from a patient?

A. Yes.

Q. Does that also memorialize any type of physical examination that a physician may give to a patient?

A. Yes.

Q. Does the physician actually prepare this report?

A. Yes.

* * *

Q. Generally, in the course of practice at Indianapolis Neurosurgical Group, who prepares these reports?

A. I'm not sure of your definition of "prepare."

Q. Who composes the actual text of these reports?

A. The person who takes the history and does the physical examination, and formulates the plan.

Q. Is that a physician?

A. Usually it is.

* * *

Q. Doctor, on the last page of this report there appears to be a block for a signature with Dr. Berkowitz's name under that. Do you see that?

A. Yes.

Q. Underneath that where it says his name, would you read that line for me, please?

A. It says, Dictated but not proofread.

\* \* \*

Q. Who prepares the language that's transcribed?

A. Dictated by Dr. Berkowitz.

Q. When does the physician at Indianapolis Neurosurgical Group dictate this material that's then transcribed?

A. It is by individual physician practice. I can tell you what I do, but I'm not sure that's what Dr. Berkowitz does.

\* \* \*

Q. How often were reports like this prepared in your practice at Indianapolis Neurosurgical Group?

A. Thousands of times.

Q. Is that done within the regular course of business at Indianapolis Neurosurgical, to create such reports?

A. Yes.

Throughout that colloquy, Wilkinson's counsel objected to Dr. Sasso testifying about the contents of Dr. Berkowitz's report because Dr. Sasso did not prepare the report, Dr. Sasso was not involved in the examination that occurred on January 27, 1999, and the last time Dr. Sasso treated Wilkinson was in late 1998, several months before Dr. Berkowitz prepared the report. Swafford's counsel responded that the report was admissible under Rule 803(6). Swafford's counsel then proceeded to ask

Dr. Sasso questions about the contents of that report, over Wilkinson's continued objection.

Dr. Berkowitz's report contains, in relevant part, Wilkinson's medical history, along with Dr. Berkowitz's medical opinions and proposed treatment plan. Dr. Sasso established that these reports are prepared in the regular course of business by the physicians at Indianapolis Neurosurgical Group. He also explained that such reports are generated after the doctor has taken information from a patient and "memorialize[s] any type of physical examination that a physician may give to a patient." Although Dr. Sasso did not know exactly when Dr. Berkowitz had dictated the report, he explained that his personal practice was to dictate the report immediately after seeing the patient or while seeing the patient. He also stated that Dr. Berkowitz examined Wilkinson on January 27, 1999, and the report is dated that same day. Dr. Sasso's statements, in addition to our review of the report itself, establishes that Dr. Berkowitz's report meets the criteria under Rule 803(6) and, thus, is not excluded by the hearsay rule. *See Brooks v. Friedman,* 769 N.E.2d 696, 701 (Ind.Ct.App.2002) (medical reports prepared by doctor that contained opinions, diagnoses, and prognoses were excluded from hearsay rule under 803(6)), *trans. denied.*[14]

▮▮▮▮ Still, as Wilkinson points out, records that are not excluded by the hearsay rule must also be otherwise admissible. *See Schaefer v. State,* 750 N.E.2d 787, 793 (Ind.Ct.App.2001). As we explained in that case:

**14.** Wilkinson did not present cogent argument to support her contention that Dr. Berkowitz's report does not qualify as a business record under Rule 803(6). Rather, she makes conclusory statements without citations to authority and, therefore, her arguments on that

issue are waived. *See Supervised Estate of Williamson v. Williamson,* 798 N.E.2d 238, 242 (Ind.Ct.App.2003) (stating party waived argument for failing to present cogent argument).

As a panel of this court said in [*Schloot v. Guinevere Real Estate Corp.*, 697 N.E.2d 1273, 1277 (Ind.Ct.App.1998)], "hospital records may not be excluded as hearsay simply because they include opinions or diagnoses. *But, and this is a substantial but, for medical opinions and diagnoses to be admitted into evidence, they must meet the requirements for expert opinions set forth in Evid. R. 702.*"

*Id.* (emphasis added); *see also In re Matter of E.T. and B.T.*, 808 N.E.2d 639, 644 (Ind.2004) (discussing Rule 803(6) and noting where party seeks to admit medical or hospital records that contain opinions, expertise of opinion giver must be established). Indiana Evidence Rule 702 provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Two requirements must be met for a witness to be qualified as an expert. *Schaefer*, 750 N.E.2d at 793. First, the subject matter must be distinctly related to some scientific field, business, or profession beyond the knowledge of the average person. *Id.* Second, the witness must have sufficient skill, knowledge, or experience in that area so that the opinion will aid the trier of fact. *Id.*

 Once the foundational requirements have been satisfied and the opinion elicited, the expert witness is subject to the hallmark of our adversarial system—cross-examination. *Id.* at 793–94. The strengths and weaknesses of the expert's opinion may be questioned against the facts, its conclusiveness or lack thereof may be explored, and lack of certitude may be fully revealed to the finder of fact. *Id.* The finder of fact is entitled to weigh and determine the credibility to be accorded the expert's opinion based on the evidence presented, including the extent of the witness's experience and expertise, the reliability of the analytical methods employed, and the degree of certitude with which the opinion is cast. *Id.*

Here, no such foundation was laid for the opinion evidence contained in Dr. Berkowitz's report. Indeed, there is no evidence regarding Dr. Berkowitz's qualifications, other than Dr. Sasso's statement that he is a physiatrist, which is a "non[-]operative spine specialist." Contrary to Swafford's suggestion, the mere fact that Dr. Berkowitz is a physiatrist does not necessarily qualify him as an expert. *See Schaefer*, 750 N.E.2d at 794 (determining no foundation laid for medical expert opinion contained in victim's medical records where doctor who rendered opinions did not testify and no evidence was presented regarding doctor's credentials).

Further, as we stated in *Schaefer*, "expressions of opinion within medical or hospital records historically have not been admissible under the business records exception because their accuracy cannot be evaluated without the safeguard of cross-examination of the person offering the opinion." 750 N.E.2d at 794 (citing *Schloot*, 697 N.E.2d at 1277). Dr. Berkowitz was not deposed, nor did he testify at trial. That is of particular concern in this case because his report contains the following opinions: (1) Wilkinson did not have a herniated disk; and (2) because there was no structural damage to her spine, she should try to work without re-

strictions. Indeed, in arguing that he was prejudiced as a result of the trial court's decision to exclude Dr. Berkowitz's report, Swafford points out that Dr. Berkowitz's opinion regarding the herniated disk "goes to the heart of Dr. Cummings['] testimony that focused prominently on a herniation in [Wilkinson's] spine." He further asserts that his substantial rights were affected by not being able to introduce Dr. Berkowitz's opinion that Wilkinson should work without restrictions. In other words, Swafford essentially concedes that, if it had been admitted, he would have relied on the report to rebut other medical opinions rendered at trial. Thus, Swafford seeks to have Dr. Berkowitz's medical opinions admitted without providing Wilkinson a chance to cross-examine him on his qualifications or basis for those opinions. In sum, we conclude that the trial court did not abuse its discretion when it excluded Dr. Berkowitz's report and Dr. Sasso's testimony based on that report.

## CONCLUSION

We remand for a new trial because Swafford failed to present sufficient evidence to support his mitigation of damages defense concerning Wilkinson's medical care. In particular, Swafford presented no evidence that Wilkinson's actions, or inactions, aggravated or increased her injuries. Although Swafford did present evidence that Wilkinson had unreasonably failed to replace lost income, remand for re-trial is warranted because we cannot be sure that the jury based its decision to allocate 45% of the total fault to Wilkinson on that basis. As we have explained, we remand for a new trial for the limited purpose of determining whether and, if so, to what extent, Wilkinson failed to mitigate her damages as a result of her alleged unreasonable failure to replace lost income. Finally, we affirm the three evidentiary rulings challenged on cross-appeal.

Affirmed in part, and remanded in part with instructions.

KIRSCH, C.J., and RILEY, J., concur.