**Richard WOLFE, D.O., Appellant–Plaintiff,**

v.

**ESTATE OF Donald CUSTER, by his wife and personal representative, Rosetta CUSTER, Appellee–Defendant.**

No. 46A03–0606–CV–256.

Court of Appeals of Indiana.

May 30, 2007.

Scott B. Cockrum, Jeremy Willett, Hinshaw & Culbertson LLP, Schererville, IN, Attorneys for Appellant.

Linda S. Aldridge, Jill D. Manges, Gillis & Aldridge LLP, South Bend, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Richard Wolfe, D.O. appeals the judgment in favor of Rosetta Custer ("Rosetta"), for herself and as personal representative of the estate of her late husband, Donald Custer ("Donald") (collectively, "the Custers"). Wolfe essentially challenges the sufficiency of the evidence, arguing that the trial court erred by entering judgment against him because the Custers failed to present expert medical testimony demonstrating that any increased risk of harm caused by Wolfe was a substantial factor in causing Donald's harm and showing that Donald's medical expenses were necessary or causally related to any act or omission by Wolfe. Concluding that the evidence was sufficient to support the jury's verdict, we affirm the trial court's entry of judgment in favor of the Custers and against Wolfe.

### Facts and Procedural History

On March 10, 1998, shortly before 7:00 p.m., sixty-five-year-old Donald Custer walked into the emergency room at St. Anthony Memorial Health Center in Michigan City with complaints of abdominal pain and vomiting a dark-colored liquid for several days. Donald also had an increased heart rate, low blood pressure, an increased respiratory rate, a high white blood cell count, a high hemoglobin level, an acidic blood level, a decreased urine output, and had not had a bowel movement for two days. Donald continued to repeatedly vomit—specifically, every thirty seconds to every three minutes—a "blood-tinged or dark" substance while he was in the emergency room. Tr. p. 387.

Wolfe started Donald on two IV lines of saline at 100 milliliters each and ordered various tests, including blood tests and a series of abdominal x-rays. The films of the abdominal series x-ray were abnormal; however, in the emergency room records, Wolfe indicated that the abdominal series x-ray was normal. Specifically, the abdominal x-ray report indicated "there [wa]s a string of pleural signs with dilation of small bowel loops consistent with a fluid filled distended small bowel" that "may be due to a severe ileus or an early small bowel obstruction." Joint Ex. 3 p. 2.

Wolfe diagnosed Donald as having acute gastrointestinal ("GI") bleed and renal failure.

Wolfe consulted with Dr. Charles Janovsky, a family physician, about having Donald admitted to the intensive care unit ("ICU"). Dr. Janovsky came to the emergency room around 9:15 p.m., reviewed Wolfe's orders, examined Donald, wrote some additional orders, and then left the emergency room around 9:55 p.m. Donald was also seen in the emergency room by Dr. Rosenblum, who did a cardiac consultation.

Donald was transferred to the ICU at 11:15 p.m. After Donald was admitted to the ICU, he was dehydrated and his blood pressure "dropped rather dramatically." Tr. p. 137. Donald received IV antibiotics and "massive fluid resuscitation" to make him "more stable for surgery." Tr. p. 138. The following day, Donald had surgery for a small bowel obstruction related to an "internal hernia" in his bowel. Tr. p. at 530.

Following his surgery, Donald stayed in the hospital for over two months with a multi-system organ failure, including lung failure, heart failure, and kidney failure. He developed adult respiratory distress syndrome, which required that he be placed on a ventilator. Donald also had sepsis, aspiration pneumonia, pulmonary edema, and was placed in a drug-induced coma. After Donald was released from the hospital, he was placed in a rehabilitation facility. Donald's medical expenses

for his two-month hospitalization at St. Anthony's totaled $331,238.27.

On March 9, 2000, the Custers filed a complaint for medical malpractice against Wolfe in the LaPorte Superior Court.[1] The case was initially stayed because the Custers had also filed a proposed medical malpractice complaint against Wolfe with the Indiana Department of Insurance.[2] In July 2002, Donald died from non-Hodgkins lymphoma, which was unrelated to his treatment from this medical malpractice claim, and his estate was substituted as the plaintiff in the medical malpractice suit in LaPorte Superior Court. On January 10, 2003, the Medical Review Panel issued an opinion, unanimously finding that Wolfe had "failed to comply with the appropriate standard of care by not reviewing the acute abdominal series of x-rays" but that "the conduct complained of was *not* a factor of the resultant damages." Joint Exhibit 8. Thereafter, in April 2004, the Custers filed a motion to amend their complaint for medical malpractice against Wolfe, and the trial court granted the motion.[3]

A six-day jury trial was held in March 2006. The Custers presented their case under an increased risk of harm standard of causation. At the beginning of trial, the parties entered joint stipulations regarding the admission of certain exhibits, including the admissibility of Plaintiff's Exhibit 11— the Custers' medical expense summary, which totaled $431,664.55. The joint stipulation provided that "the parties stipulate to the admissibility of the [Custers'] medi-

1. The Custers also named Emergency Physicians Medical Group, Charles Janovsky, M.D., The Medical Group of Michigan City, and St. Anthony Memorial Health Center as defendants but then agreed to have them dismissed without prejudice.

2. A copy of the proposed complaint is not included in the Appellant's Appendix; howev-

er, the opinion of the Medical Review Panel reveals that the Custers also filed their proposed complaint against Emergency Physicians Medical Group, Charles Janovsky, M.D., The Medical Group of Michigan City, and St. Anthony Memorial Health Center.

3. Wolfe did not include a copy of the amended complaint in his Appellant's Appendix.

cal expense summary ... however, [Wolfe] does not stipulate that the charges were reasonable and necessary, and [Wolfe] disputes that any of the expenses were proximately caused by any act or omission of Dr. Wolfe." Appellant's App. p. 26.

During the trial, the Custers presented medical testimony from Dr. Jennifer Lackman, an emergency room physician, Dr. David Hough, an internal medical physician, and Dr. Michael Born, an emergency room physician who was a member of the Medical Review Panel that reviewed the Custers' claim against Wolfe. Dr. Born testified—consistent with his determination in the Medical Review Panel opinion—that Wolfe had failed to comply with the appropriate standard of care by either not reviewing the acute abdominal series of x-rays and checking that it was normal or by reviewing it and misinterpreting it as normal.

Dr. Lackman testified that Wolfe did not meet the standard of care by: (1) failing to make a correct diagnosis because Donald's presenting symptoms in the emergency room did not support the diagnosis of a GI bleed and instead supported the diagnosis of "an intra-abdominal catastrophe" and "impending sepsis[;]" (2) failing to review the abdominal series x-ray and marking it as normal; (3) failing to properly hydrate with IV fluids; (4) failing to order antibiotics when Donald "obviously came in [the ER] showing signs of sepsis[;]" and (5) failing to order an immediate surgical consult. Tr. p. 83, 130, 147.

Dr. Lackman explained how Donald's various symptoms and lab results were inconsistent with Wolfe's diagnosis of a GI bleed and were, instead, indicative of an intra-abdominal catastrophe, sepsis, and dehydration. Dr. Lackman testified that "taking the whole clinical picture of this patient, in my mind, you know, sick patient, abnormal lab work, abnormal vital signs, abdominal pain, I would be thinking of ... impending intra-abdominal catastrophe" and that the abdominal x-ray "support[ed] that there [wa]s something going on in the intestine." Id. at 118. Dr. Lackman further testified that Wolfe "had an obligation to make a more definitive diagnosis than he did to get [Donald] on the right track of treatment" and that "what [Donald] needed was surgical intervention and antibiotics" but that when Wolfe "look[ed] at this film and call[ed] it normal it took him down the wrong path of treatment." Id. at 118–19.

Dr. Lackman testified that "the lack of a diagnosis and the lack of interventions ... specifically early surgery consult and early antibiotics put [Donald] at an increased risk of harm." Id. at 150. Dr. Lackman testified that Wolfe's "delay in getting a surgical consult and the delay in starting antibiotics put [Donald] at increased risk of harm for a bad outcome" for a "[m]ulti-system failure" and sepsis. Id. at 144. Dr. Lackman testified that sepsis was "a chemical cascade" that occurs in the body from infection and that causes a patient to "get to a point and just go kind of downhill at a chemical level" but that the cascade can be stopped if antibiotics are given. Id. at 134, 143. Dr. Lackman further described the cascade as follows:

[P]atients who come in and are showing signs of sepsis, if something isn't done to stop that cascade, then they will develop multi-system organ failure, wind up in the intensive care unit, and then sometimes they will recuperate from that and sometimes they won't, again what you want to do is get the antibiotics on board so you stop that cascade. You want to try to get the antibiotics on board so that you stop the cascade so that the multi-symptom organ failure doesn't develop, because once you get into that situation then like I say you've got a

sixty-five year old who is sitting in an intensive care unit, um, patients like that don't tolerate blood pressure drops well, I mean, it can cause damage to various organ systems and things like that and they don't tolerate oxygen levels dropping and things like that happen when they wind [up] on ventilators and they wind up needing Swan–Ganz monitors to get their blood pressure up and that sort of thing.

*Id.* at 145–46. Dr. Lackman testified that if Wolfe would have put Donald on antibiotics in the emergency room, Donald would have been at a "decreased risk" for the multi-system organ failure. *Id.* at 146. Dr. Lackman also testified that studies have shown that a delay in a patient receiving antibiotics increases the patient's risk for a bad outcome and "the higher the chance for that downward spiral continuing." *Id.* at 143. Specifically, she testified that the risk of that bad outcome is increased by six to ten percent for each hour that antibiotics are delayed up to thirty-six hours.

Dr. Hough also testified that Wolfe had breached the standard of care in his treatment of Donald. Specifically, Dr. Hough testified that Wolfe's failure to review the abdominal x-ray, failure to correctly diagnose Donald with a small bowel obstruction and failure to get an immediate surgical consult put Donald at an increased risk of harm and that earlier intervention could have stopped the cascade earlier and decreased the risk of having multi-system organ failure. Dr. Hough testified that Donald needed an immediate surgical consult because there was "something catastrophic going on within the abdomen[.]"

*Id.* at 530. Dr. Hough also testified that "the quicker we get antibiotics on board the less likelihood we have that it's going to continue the cascade." *Id.* at 536. Dr. Hough described the "cascade" as follows:

[I]t's kind of like tipping over a domino when you stack them all up. Wherever the hernia starts, that's the first domino. And then as it fills up with fluid, that's the next domino and then as it begins to leak, that's another domino, and then as the patient becomes dehydrated because he's vomiting because nothing is going through, that's another domino. And as his blood pressure drops, that's another domino, and then when the kidneys don't get blood flow because they're hypotensive, that's another domino. And then pretty soon you have this rapid, you know, it's just like you see on TV when they tip over the domino it just goes faster and faster and faster. So at some place you have to stop tipping over the domino. That's what the cascade is all about. So you have this cascade of events of tachycardia, hypotension, kidney failure, then the heart fails, the lung fails, you know, and it just gets worse until the patient dies. So that's what we mean by the cascade of events.

*Id.* at 536–37. Dr. Hough testified that if Wolfe could have stopped the cascade earlier, then Donald "would have had less chance of having these multi-system organ failure[s]." *Id.* at 539.

After the Custers presented their case-in-chief, Wolfe moved for judgment on the evidence pursuant to Indiana Trial Rule 50.[4] Wolfe argued, in part, that there was "insufficient evidence submitted on ... the

4. Indiana Trial Rule 50(A) provides:
Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict. A party may move for such judgment on the evidence.

issue of the proximate cause" because the alleged increased risk of harm was "unquantified" and was not shown to be a "substantial factor" in Donald's damages and that the evidence presented regarding damages did "not establish that those bills [we]re reasonable and necessary" or "that they were proximately caused by anything that Dr. Wolfe did or did not do." *Id.* at 629–30. The trial court denied Wolfe's motion for judgment on the evidence. Wolfe then presented evidence on his own behalf but did not renew his motion for judgment on the evidence at the close of evidence.

The jury returned a verdict in favor of the Custers and determined the amount of damages to be $432,000.00. Specifically, the jury found that the damages for Donald's estate to be $332,000.00 and the damages for Rosetta's loss of consortium claim to be $100,000.00. The trial court then entered judgment in favor of the Custers and against Wolfe for the $432,000.00. Thereafter, Wolfe filed a motion to correct error, alleging that the trial court erred by denying his motion for judgment on the evidence and that the jury's verdict was excessive and against the weight of the evidence. The trial court held a hearing on Wolfe's motion to correct error and denied the motion. Wolfe now appeals.

## Discussion and Decision

 On appeal, Wolfe argues that the trial court erred by entering judgment against him because the evidence was insufficient to support the jury's verdict.[5] Specifically, Wolfe contends that the evidence was insufficient to support a finding of medical malpractice against him because the Custers failed to meet their burden of showing causation under an increased risk of harm standard by failing to present expert testimony indicating that any increased risk of harm caused by Wolfe was a substantial factor in causing Donald's harm and quantifying the increased risk of harm from which the jury could assess damages. Wolfe also argues that the Custers failed to present any evidence showing that Donald's medical expenses were necessary or causally related to any act or omission by Wolfe.

 Before we address Wolfe's arguments, we note that in reviewing the suffi-

5. In his Appellant's Brief, Wolfe set forth his argument regarding the lack of evidence by arguing that the trial court erred by denying his motion for judgment on the evidence. However, following the trial court's denial of Wolfe's motion for judgment on the evidence, he presented evidence on his own behalf and did not renew his motion for judgment on the evidence at the close of evidence. Therefore, any appeal of the denial of Wolfe's judgment on the evidence motion is waived based on his subsequent presentation of evidence. *See Davidson v. Bailey*, 826 N.E.2d 80, 87 n. 9 (Ind.Ct.App.2005) (noting that a defendant waives any alleged error regarding the denial of a motion for judgment on the evidence when he moves for judgment on the evidence and then introduces evidence on his own behalf after the motion is denied); *see also* Ind. Trial Rule 50(A)(6) ("A motion for judgment on the evidence made at one stage of the proceedings is not a waiver of the right of the court or of any party to make such a motion ... except that error of the court in denying the motion shall be deemed corrected by evidence thereafter offered or admitted."). Despite Wolfe's waiver of the denial of his motion for judgment on the evidence, we will address his argument as a sufficiency challenge.

Additionally, in his appellate brief, Wolfe mentions in passing the denial of his motion to correct error, in which he alleged that the trial court erred by denying his motion for judgment on the evidence. Wolfe, however, does not provide any argument specifically addressing the denial of his motion to correct error, and, instead, concentrates his argument on the trial court's denial of his motion for judgment on the evidence. Thus, we will review his allegations of error in the context of a challenge to the sufficiency of the evidence.

ciency of evidence in a civil case, we will decide whether there is substantial evidence of probative value supporting the judgment. *Jamrosz v. Resource Benefits, Inc.*, 839 N.E.2d 746, 758 (Ind.Ct.App. 2005), *trans. denied.* We neither weigh the evidence nor judge the credibility of witnesses but consider only the evidence most favorable to the judgment along with all reasonable inferences to be drawn therefrom. *Davidson v. Bailey*, 826 N.E.2d 80, 87 (Ind.Ct.App.2005). "The verdict will be affirmed unless we conclude that it is against the great weight of the evidence." *Id.*

## I. Causation—Increased Risk of Harm

We first address Wolfe's argument that the Custers failed to meet their burden of showing causation under an increased risk of harm standard by failing to present expert testimony indicating that any increased risk of harm caused by Wolfe was a substantial factor in causing Donald's harm and quantifying the increased risk of harm from which the jury could assess damages.

In general, a plaintiff must prove each of the elements of a medical malpractice case, which are that: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind.1995). However, as a method of determining causation in certain medical malpractice cases, the Indiana Supreme Court adopted the "increased risk of harm" standard as set forth

in Restatement (Second) of Torts § 323, which provides, in part:

> One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm ... [.]

*Id.* at 1388. Section 323 allows recovery where "a negligent health care provider claims that the recovery of damages is not warranted because the patient would have suffered injury or death anyway." *Id.* The *Mayhue* Court explained that a traditional proximate cause analysis is inequitable in certain medical malpractice actions:

> Where a patient's illness or injury already results in a probability of dying greater than 50 percent, an obvious problem appears. No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact. The plaintiff must ordinarily prove that proper diagnosis and treatment would have prevented the patient's injury or death. In cases such as this one, it appears that a defendant would always be entitled to summary judgment.

*Id.* at 1387. The Court addressed this inequitable situation by examining the Restatement (Second) of Torts § 323 and the loss of chance doctrine.[6] *Id.* at 1387–88.

---

**6.** "The 'pure loss of chance' doctrine compensates for the loss of the chance itself and not for the plaintiff's physical injury that was incurred but likely even before the defendant's act or omission." *Dughaish ex rel. Dughaish v. Cobb*, 729 N.E.2d 159, 166 n. 7 (Ind.Ct.

App.2000), *reh'g denied, trans. denied.* Under the loss of chance doctrine, "[t]he compensable injury is not the result, which is usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negli-

*Relying on McKellips v. Saint Francis Hospital, Inc.*, 741 P.2d 467 (Okla.1987), the Mayhue Court adopted § 323 because it "establishe[d] a more procedurally-oriented response to such claims" and was the approach that was "most consistent with Indiana law, particularly our strong faith in the ability of the jury to decide such complex questions." *Id.* at 1388–89.

Thus, under the § 323 "increased risk of harm" standard of causation, "plaintiffs with a less than fifty percent chance of recovery, who have suffered a decreased chance of recovery from illness or injury due to the negligence of a health care provider, are provided with a means of recovery." *Dughaish ex rel. Dughaish v. Cobb*, 729 N.E.2d 159, 166 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.* Restatement (Second) of Torts § 323, "by its terms, presupposes that physical harm has resulted from the negligent care[,]" *Alexander v. Scheid*, 726 N.E.2d 272, 278 (Ind. 2000), and "provides for recovery for the increased risk of harm attributable to the defendant's conduct." *Smith v. Washington*, 734 N.E.2d 548, 550 (Ind.2000), *reh'g denied.*

▉ Both parties agree that the § 323 increased risk of harm standard of causation, as set forth in *Mayhue*, applies in the instant case. In order to prove a doctor's liability under a § 323 analysis, a plaintiff must demonstrate that: (1) the doctor was negligent; (2) the negligent act increased the risk of harm; and (3) the "negligence was a substantial factor in causing the plaintiff's harm." [7] *Mayhue*, 653 N.E.2d at 1388. Here, the trial court apparently instructed the jury on the increased risk of harm standard of causation and a plaintiff's burden of proof.[8]

---

gent." *Mayhue*, 653 N.E.2d at 1387. The Indiana Supreme Court has distinguished § 323 from the loss of chance doctrine by explaining that § 323 "deal[s] with claims for increased risk for an injury that has been incurred" while the loss of chance doctrine applies "where, although the risk had been increased, the plaintiff's ultimate injury was uncertain." *Cahoon v. Cummings*, 734 N.E.2d 535, 544 (Ind.2000).

7. We note that Wolfe cites to the third element of the § 323 standard as requiring a plaintiff to show that the "increased risk" was a "substantial factor" in causing the plaintiff's harm. Appellant's Br. p. 15. But, at the same time, Wolfe also quotes *Mayhue*, which provides that a plaintiff must prove that the defendant's "negligence" was a "substantial factor" in causing the plaintiff's harm. *Id.* (quoting *Mayhue*, 653 N.E.2d at 1388). We believe that this element of § 323 is more properly stated that a plaintiff must "prove by a preponderance of evidence that the defendant's negligence was a substantial factor in causing the plaintiff's harm." *See Mayhue*, 653 N.E.2d at 1388. Indeed, the trial court instructed the jury that the third element showing causation under § 323 required a plaintiff to show that "the defendant's *negligence* was a substantial factor in causing the

plaintiff's harm," *see* Appellant's Br. p. 4 (emphasis added), and Wolfe concedes that this instruction was proper.

8. According to Wolfe, the trial court gave the following instruction as Final Jury Instruction Number Eighteen:

A health care provider is subject to liability to the patient for the physical harm resulting from his failure to exercise reasonable care, if his failure to exercise such care increases the risk of physical harm to the patient.
If you find that the plaintiff has proven by a preponderance of the evidence that:
1. The defendant was negligent, and
2. The defendant's negligence increased the risk of harm, and
3. [T]he defendant's negligence was a substantial factor in causing the plaintiff's harm,
Then you must determine the amount of money that would fairly compensate the plaintiff for his increased risk of harm.
This is a three-step process.
First, determine the total amount of money that would fairly compensate the plaintiff's injury.
Next, determine the "increased risk" by subtracting the risk before the defendant's

Wolfe does not contest the fact that evidence was presented establishing that Wolfe was negligent or that his negligence increased the risk of harm; instead, he argues that the Custers failed to prove that the increased risk of harm was a substantial factor in causing Donald's harm because there was no expert testimony specifically stating that the increased risk was a substantial factor and no evidence quantifying the increased risk of harm.[9]

First, in regard to Wolfe's argument that the Custers needed to present expert testimony specifically stating that Wolfe's negligence was a "substantial factor," we decline to adopt Wolfe's "magic words" approach to determining if a plaintiff has met his or her burden of proving causation. Indeed, the Indiana Supreme Court has explained that "once the plaintiff proves negligence and an increase in the risk of harm, the jury is permitted to decide whether the medical malpractice was a substantial factor in causing the harm suffered by the plaintiff." *Mayhue*, 653 N.E.2d at 1388.

Here, the Custers presented evidence from which the jury could have reasonably inferred that Wolfe's negligence was indeed a substantial factor in Donald's harm. As explained earlier, both Dr. Lackman and Dr. Hough testified that Wolfe's treatment, or lack thereof, of Donald in the emergency room increased the risk of harm to Donald. Dr. Hough described Donald's harm or injuries in this case as including sepsis and a multi-system organ failure of "lung failure, heart failure, [and] kidney failure." Tr. p. 539. Dr. Lackman and Dr. Hough's testimony focused on Wolfe's failure to correctly diagnosis Donald with a bowel obstruction, failure to see that Donald had a "catastrophe" occurring in his abdomen, failure to order an immediate surgical consultation, and failure to put Donald on antibiotics and how these failures increased the risk of harm and contributed to the "cascade" that led to Donald's sepsis and multi-system organ failure. *Id.* at 83, 143, 145, 530.

Further, Dr. Lackman testified that "the lack of a diagnosis and the lack of interventions . . . specifically early surgery consult and early antibiotics put [Donald] at an increased risk of harm" for multi-system organ failure and sepsis. *Id.* at 150. Also, Dr. Hough testified that Wolfe's failure to review the abdominal x-ray, failure to correctly diagnose Donald with a small bowel obstruction, and failure to get an immediate surgical consult put Donald at an increased risk of harm and that earlier intervention, including antibiotics, could have stopped the cascade earlier and decreased the risk of having multi-system organ failure. There was sufficient evidence from which the jury could infer that

negligence from the risk of harm after the defendant's negligence.
 Last, multiply the damages you find would result from plaintiff's injury by the "increased risk" of harm.
Appellant's Br. p. 3–4. Despite his reference to the instruction in his appellant's brief, Wolfe did not include a copy of the instruction in his Appellant's Appendix. Thus, we direct Wolfe's attention to Indiana Appellate Rule 22(C), providing, in part, that "[a]ny record material cited in an appellate brief must be reproduced in an Appendix or the

Transcript or exhibits." Nevertheless, Wolfe does not challenge the instruction on appeal and, in fact, concedes that it was a proper instruction. *See* Appellant's Br. p. 23. Furthermore, the Custers do not dispute that this instruction was given to the jury.

9. Although Wolfe's argument focuses on the insufficiency of the evidence to show that the "increased risk" was a substantial factor, we will review this case under the standard set forth in *Mayhue*, i.e., that the "negligence" was a substantial factor. *See supra* note 7.

Wolfe's negligence was a significant factor in causing Donald's harm.

Nevertheless, Wolfe further argues the evidence presented by the Custers was faulty in that it failed to quantify the increased risk of harm. As the Custers point out, the Custers did submit evidence quantifying the risk of harm. In particular, Dr. Lackman stated in her direct examination that the failure of Dr. Wolfe to order any antibiotics for Mr. Custer increased the risk of a bad outcome to Mr. Custer by 6% to 10% per hour of delay up to 36 hours.[10]

In summary, we conclude that Custers presented evidence from which the jury could have reasonably inferred that Wolfe's negligence was a substantial factor in Donald's harm. Although what constitutes a substantial factor may be difficult to describe, as noted by our Supreme Court in *Mayhue*, we have "strong faith in the ability of the jury to decide such complex questions." *Mayhue*, 653 N.E.2d at 1389. Here, the jury was required to decide this complex question and did so in the Custers' favor. Because the evidence was sufficient to support the jury's verdict, the trial court did not err by entering judgment against Wolfe on the Custer's medical malpractice claim.

## II. Damages—Medical Expense Summary

We next address Wolfe's argument that the evidence was insufficient to support a finding of medical malpractice and damages against him because the Custers failed to present any evidence showing that Donald's medical expenses were necessary or causally related to any act or omission by Wolfe.

■■■■ "[U]pon a showing of causation under *Mayhue*, damages are proportional to the increased risk attributable to the defendant's negligent act or omission." *Cahoon v. Cummings*, 734 N.E.2d 535, 541 (Ind.2000). In *Cahoon*, the Indiana Supreme Court adopted the standard for measuring damages under § 323 of the Restatement (Second) of Torts as set forth in *McKellips*, 741 P.2d 467. Specifically, the *Cahoon* Court explained that in order to determine proportional damages, "statistical evidence is admissible to determine the 'net reduced figure.'"[11] *Id.* (quoting *McKellips*, 741 P.2d at 476–77). The Indiana Supreme Court explained that this "net reduced figure" or "lost chance" is determined by "subtracting the decedent's postnegligence chance of survival from the prenegligence chance of survival."[12] *Cahoon*, 734 N.E.2d at 540; *see also Smith*,

---

10. We note, however, that a quantification of the increased risk is likely not required in order for a plaintiff to prove causation. In *McKellips*, the case upon which our Indiana Supreme Court relied when adopting the § 323 standard of causation and calculation of resulting damages, the Oklahoma Supreme Court explained that it was "unnecessary to require a precise percentage increment of chance of recovery or survival to create a jury question on *causation*." *McKellips*, 741 P.2d at 475 (emphasis added). Given our Supreme Court's close tracking of *McKellips* on issues relating to § 323, we reject Wolfe's argument that the Custers failed to prove causation under § 323 because they failed to provide quantification testimony. Nevertheless, as explained below, evidence of quantifi-

cation is required in relation to the damages issue in a § 323 case.

11. The *McKellips* Court explained that this statistical evidence "merely provides a base estimate and is not in itself sufficient to make the damage determination" and that "facts relevant to the particular patient should also be weighed in determining the net reduced figure used to represent the patient's loss of survival chance attributable to the defendant's negligence." *McKellips*, 741 P.2d at 476.

12. The *McKellips* Court explained that when determining postnegligence and prenegligence chances of survival used to determine the net reduced figure, "the jury should select from the figures presented [by the parties

734 N.E.2d at 551. Thereafter, "[t]he amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action." *Id.* at 540–41 (quoting *McKellips,* 741 P.2d at 476); *see also Smith,* 734 N.E.2d at 551.

Here, at the beginning of trial, the parties entered joint stipulations regarding the admission of certain exhibits, including the admissibility of Plaintiff's Exhibit 11— the Custers' medical expense summary, which totaled $431,664.55. The joint stipulation provided that "the parties stipulate to the admissibility of the [Custers'] medical expense summary ... however, [Wolfe] does not stipulate that the charges were reasonable and necessary, and [Wolfe] disputes that any of the expenses were proximately caused by any act or omission of Dr. Wolfe." Appellant's App. p. 26. Additionally, as noted above, the trial court instructed the jury that if it found that the Custers had met their burden on causation, then it needed to go through the following "three-step process" to "determine the amount of money that would fairly compensate the plaintiff for his increased risk of harm[:]"

> First, determine the total amount of money that would fairly compensate the plaintiff's injury.
> Next, determine the "increased risk" by subtracting the risk before the defendant's negligence from the risk of harm after the defendant's negligence.
> Last, multiply the damages you find would result from plaintiff's injury by the "increased risk" of harm.

Appellant's R. p. 3–4.

First, we will address Wolfe's argument that the evidence was insufficient regarding postnegligence and prenegligence chance of survival] or choose appropriate fig-

to support the judgment against him because the Custers failed to present any evidence showing that Donald's medical expenses were necessary.

While it is true that Wolfe did not stipulate that the medical expenses were reasonable and necessary, a summary of the medical expenses was admitted into evidence. With regard to medical statements, Indiana Evidence Rule 413 provides: "Statements of charges for medical, hospital or other health care expenses for diagnosis or treatment occasioned by an injury are admissible into evidence. Such statements shall constitute prima facie evidence that the charges are *reasonable.*" (Emphasis added). As our Indiana Supreme Court explained in *Cook v. Whitsell–Sherman:*

> In order to recover an award of damages for medical expenses, the party seeking to recover these damages must prove that the expenses were both reasonable and necessary. This was traditionally proven by expert testimony. The purpose of Rule 413 is to provide a simpler method of proving the amount of medical expenses when there is no substantial issue that they are reasonable and were caused by the tort. *If there is a dispute, of course the party opposing them may offer evidence to the contrary, including expert testimony.* By permitting medical bills to serve as prima facie proof that the expenses are reasonable, the rule eliminates the need for testimony in that often uncontested issue. *Finally, the fact that a statement was submitted is at least some evidence that the charge is normal for the treatment involved, and it was necessary to be performed.*

ures[.]" *McKellips,* 741 P.2d at 476.

796 N.E.2d 271, 277–78 (Ind.2003) (citation omitted and emphases added).

Therefore, according to *Cook*, Plaintiff's Exhibit 11 constitutes "some evidence" that the charge is normal for the treatment involved—or in other words, reasonable—and that the treatment was necessary to be performed. *See id.* "Indeed, *Cook* clarifies that, unless the opposing party presents evidence to dispute that medical treatment and the resulting expenses were made necessary by the accident, medical bills are admissible to show that the medical services performed were necessary." *Wilkinson v. Swafford,* 811 N.E.2d 374, 387 (Ind.Ct.App.2004), *abrogated in part on other grounds by Willis v. Westerfield,* 839 N.E.2d 1179 (Ind.2006) (citing *Cook,* 796 N.E.2d at 277). Wolfe, however, presented no evidence to dispute that the expenses listed in Plaintiff's Exhibit 11 were medically necessary. Accordingly, his argument that the evidence was insufficient to show that Donald's medical expenses were necessary must fail.

Next, we address Wolfe's argument that the evidence was insufficient to support the judgment against him because the Custers failed to present any evidence showing that Donald's medical expenses were causally related to any act or omission by Wolfe. Specifically, Wolfe contends that the Custers "failed to present any evidence to prove that the proffered medical expense summary had any medical expenses [that] were causally related to any negligent act." Appellant's R. p. 25.

Wolfe's argument regarding the causal relationship of the medical expense summary is a further attack on the sufficiency of the evidence; but, such an argument is only appropriate to a case using a traditional proximate cause analysis. Here, however, the case was submitted to the jury under § 323. As explained above, in certain medical malpractice cases, such as we have here, the "increased risk of harm" standard as set forth in Restatement (Second) of Torts § 323 supplants the traditional proximate cause analysis. *Mayhue,* 653 N.E.2d at 1388. Thus, in § 323 cases, instead of a plaintiff being required to show that a doctor's breach proximately caused the plaintiff's injury, the plaintiff must demonstrate that the doctor was negligent, that the negligent act increased the risk of harm, and that the negligence was a substantial factor in causing the plaintiff's harm. *Mayhue,* 653 N.E.2d at 1388. Once a plaintiff makes such a showing, then § 323 "provides for recovery for the increased risk of harm attributable to the defendant's conduct." *Smith v. Washington,* 734 N.E.2d 548, 550 (Ind.2000). Thus, once a plaintiff shows causation under § 323, the determination of damages under § 323, as explained in *Cahoon,* will only allow a plaintiff to recover those damages that are proportionally related to the increased risk of harm. Because the application of § 323 replaces the requirement of showing a causal relationship under the traditional proximate cause analysis, we conclude that Wolfe's argument fails.[13]

---

**13.** Despite his agreement that the trial court properly instructed the jury on the calculation of damages, Wolfe questions the jury's determination of damages because of the fact that during deliberations, the jury sent the trial court a question, which stated: "Do we need to attach a monetary value to negligence even if the Jury does not find guilty to number two and number three on final instruction number eighteen?" Tr. p. 774–75. The trial court answered the jury by responding: "Jury is instructed to reread the final instructions." *Id.* at 775. Thereafter, the jury returned a verdict in favor of the Custers. We disagree with Wolfe's suggestion that the jury did not properly calculate damages. "[W]hen the jury is properly instructed, it may be presumed on appeal that they followed such instruction." *Chandler v. State,* 581 N.E.2d 1233, 1237 (Ind.1991).

We have already held that there was evidence to support the jury's finding that the Custers had met their burden of proving causation under § 323—that is, showing that Wolfe was negligent, that the negligent act increased the risk of harm, and that Wolfe's negligence was a substantial factor in causing Donald's harm. Furthermore, the Custers presented evidence regarding the quantification of the increased risk of harm. Additionally, the trial court instructed the jury regarding the calculation of damages in a § 323 case such as this, and the trial court's instruction is consistent with our Indiana Supreme Court's explanation of § 323 damages in *Cahoon,* 734 N.E.2d at 540–41, and *Smith,* 734 N.E.2d at 551.

In summary, the evidence was sufficient to support a finding of medical malpractice against Wolfe, and the trial court did not err by entering judgment for $432,000.00 in favor of the Custers and against Wolfe.

Affirmed.

BAILEY, J., and BARNES, J., concur.