**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 29 2012, 9:30 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**LAURA R. CROWLEY**
Lee, Cossell, Keuhn & Love
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**PETER H. POGUE**
**KORI L. McOMBER**
**RACHEL K. HEHNER**
Schultz & Pogue, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| THOMAS PINE, Individually and as Administrator for the ESTATE OF HELEN PINE, Deceased,    )<br>)<br>)<br>)<br>Appellant-Plaintiff,   )<br>)<br>vs.   )<br>)<br>STIRLING CLINIC, INC.,   )<br>ALBERT C. LEE, M.D., and INDIANA   )<br>NEUROLOGY SPECIALTY CARE,   )<br>)<br>Appellees-Defendants.   ) | No. 49A02-1105-CT-382 |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patrick L. McCarty, Judge
Cause No. 49D03-0712-CT-52890

**February 29, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-plaintiff, Thomas Pine, individually and as administrator for the Estate of Helen Pine (Mrs. Pine), deceased, appeals the trial court's grant of summary judgment in favor of the appellees-defendants Stirling Clinic, Inc. (Stirling Clinic), Albert C. Lee, M.D., (Dr. Lee), and Indiana Neurology Specialty Care (Indiana Care) (collectively, the Appellees). Specifically, Pine argues that genuine issues of material fact exist regarding his medical malpractice claim against the Appellees because he presented evidence that the physician's negligence in failing to diagnose and treat his wife's cancer contributed to her death. Pine further maintains that the fact finder should determine the damages that should be awarded after hearing evidence regarding the degree to which the Appellees failure to properly diagnose the tumor increased the risk of harm to his wife.

Concluding that the trial court properly granted summary judgment in the Appellees' favor, we affirm.

FACTS

Sometime in 2001, Dr. Robert Stirling, from the Stirling Clinic in Indianapolis, treated Mrs. Pine for neck and back pain that was presumably arthritis. Dr. Stirling rendered several treatments that included some trigger point injections. Although Mrs. Pine's pain ceased for a while, it recurred in June 2002. Mrs. Pine was then referred to Dr. Lee, a physician at Indiana Care, in November 2002, for neck and arm pain.

2

On January 27, 2003, Mrs. Pine underwent radiological testing that revealed a cancerous mass near her spine. Although Mrs. Pine was treated for her cancer, she died on March 3, 2003. Because no autopsy was conducted, it was never determined exactly what type of cancer caused Mrs. Pine's death. Pine filed an "anonymous complaint" for damages in the Marion Superior Court on October 19, 2004, alleging that the Appellees were negligent for failing to conduct any radiological testing and diagnosing his wife's cancer.[1]

Thereafter, the case was presented to a Medical Review Panel (Review Panel) for determination. On September 24, 2007, the Review Panel issued the following opinion:

> Having reviewed all of the evidence submitted by the parties to the Panel in this case, the Panel hereby renders its expert opinion.
>
> The Panel is of the unanimous opinion that the evidence supports the conclusion that Defendants, [Dr. Lee] and [Indiana Care], failed to meet the applicable standard of care, but that such conduct was not a factor in the damages claimed.

Appellees' Supp. App. p. 8-9.

On December 13, 2007, Pine filed an amended complaint alleging, among other things, that Dr. Lee, as Indiana Care's agent, committed medical malpractice during the care and treatment of Mrs. Pine from November 6, 2002, to January 27, 2003. Pine specifically alleged that Dr. Lee failed or refused to adequately and timely diagnose Mrs.

---

[1] In his complaint, Pine named "Doctor 1, Health Care Provider 1 Inc., Doctor 2 and Health Care Provider 2," as the Defendants. Appellees' Supp. App. p. 1. In accordance with Indiana Code section 34-18-8-7, a claimant may commence an anonymous action in state court against qualified healthcare providers at the same time of the filing of a claim before the Indiana Department of Insurance. Until the medical review panel has been formed and convened to review the care at issue in the proposed complaint, the trial court may not take any action on the case other than setting a trial date.

Pine's cancer, thus increasing her risk of harm. As a result, Pine claimed that because of the Appellees' negligence, Mrs. Pine "was denied the chance of survival and perished." Id. at 27.

Discovery commenced, and on October 12, 2009, the parties deposed Pine's expert witness, Dr. E. Allen Griggs. Dr. Griggs was questioned about the alleged breaches of the standard of care and medical causations. More particularly, Dr. Griggs was asked his opinion about Mrs. Pine's percentage loss of survival in light of the diagnosis and treatment and whether there was a significant increase in risk of harm as a result of the alleged delay in diagnosis. Dr. Griggs responded, that he "wouldn't know," and . . . "don't know. I couldn't—you know, an oncologist or hematologist may be able to opine on that, but I don't think so. I couldn't really tell you the percentage." Appellant's App. p. 24.

Dr. Griggs was asked by Dr. Lee's counsel whether he would be testifying at trial about what percentage that the risk of harm was increased by the purported delay in the diagnosis of the cancerous tumor. Dr. Griggs responded that his opinions were more qualitative and that he would have to defer to an oncologist to put a specific percentage on the increased risk of harm.

In response to questioning by Stirling Clinic's counsel, Dr. Griggs testified that Mrs. Pine's tumor had more than likely been in existence since May or June 2001 in the soft tissues of the spine when her arm and neck pain began. Dr. Griggs believed that Stirling Clinic should have ordered a plain film X-ray of the spine. And the X-ray might

4

have "picked something up there" in the area where the neoplastic mass was located. Appellant's App. p. 123.

Dr. Griggs was then asked about Mrs. Pine's prognosis. Dr. Griggs believed that the prognosis was "grave" and determined that Mrs. Pine's illness was "terminal," . . . no matter what was done." Id. at 124. Dr. Griggs also testified that because the particular type of cancer that Mrs. Pine had could not have been determined, no response could have been measured with regard to "any kind of treatment." Id. And because no autopsy had been performed on Mrs. Pine's body, Dr. Griggs acknowledged that it was not even known "where the primary tumor was." Id.

Dr. T. Howard Lee, the designated defense trial expert on causation and damages, had practiced for over thirty years in treating metastatic non-small cell tumors. Dr. Lee reviewed Mrs. Pine's medical records and testified that the metastatic tumor was from a source of 1) more likely than not lung; 2) possibly breast; 3) head and neck. His opinion that it was more than likely from a primary lung tumor was because Mrs. Pine had been a long-time cigarette smoker. Dr. Lee also testified that figuring out the location of the primary tumor is of no significance in determining the patient's prognosis. In other words, Dr. Lee believed that once the primary tumor had migrated to the spine, additional treatment would not have altered the outcome.

At some point, the following exchange occurred:

Q: So if I'm hearing you correctly, if there's metastases from the primary tumor, whether it be breast or lung—those are the two that you think it's more likely. It's one or the other but more likely the lung. Would it be fair

5

to say that Helen Pine's outcome, survivability from this tumor was cast in stone the moment it (cancer) invaded the tissues in the spinal cord?

. . .

A: Dr. Lee: I think the word—if you use the word determined, the outcome is determined at that point, yes.

Appellant's App. p. 128-29.

On December 7, 2010, Dr. Lee and Indiana Care filed motions for summary judgment, arguing that they were entitled to judgment as a matter of law because Pine could not sustain his burden of proof as to damages. In other words, the Appellees asserted that Pine was unable to demonstrate that Dr. Lee's delay in diagnosing Mrs. Pine's cancer resulted in any quantifiable damages, because "there was absolutely no increased risk of harm caused by Dr. Lee's alleged delay in diagnosing Mrs. Pine's cancer from November 6, 2002, to January 27, 2003." Appellant's App. p. 13.

Thereafter, Stirling Clinic filed a joinder motion for summary judgment. Following a hearing on Lee and Indiana Care's motion for summary judgment, the trial court issued an order on February 22, 2011, stating in part that:

> [B]ased on the grounds that plaintiff is unable to prove the element of causation that Dr. Lee's alleged delay in diagnosing Mrs. Pine's cancer from November 6, 2002, to January 22, 2003, ultimately increased her risk of harm, this Court expressly directs that judgment is summarily entered in favor of defendants, Albert C. Lee, M.D., and [Indiana Care], and against plaintiff Thomas Pine, Individually and as the Administrator for the Estate of Helen Pine, Deceased, as to any and all claims.

Appellant's App. p. 84.

Thereafter, the trial court conducted a hearing on Stirling Clinic's motion on March 30, 2011, and granted summary judgment in its favor. Pine now appeals.

## DISCUSSION AND DECISION

### I. Standard of Review

When reviewing a grant of summary judgment, our standard of review is the same as the trial court. Cleary v. Manning, 884 N.E.2d 335, 337 (Ind. Ct. App. 2008). Considering only those facts that the parties designated to the trial court, we must determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. Id.; Ind. Trial Rule 56(C). In answering these questions, we construe all factual inferences in the nonmovant's favor and resolve all doubts as to the existence of a material issue against the movant. Id. We will affirm summary judgment if there is any basis in the record for upholding the judgment. Hyperbaric Oxygen Therapy Sys., Inc. v. St. Joseph Med. Center of Fort Wayne, Inc., 683 N.E.2d 243, 247 (Ind. Ct. App. 1997).

### II. Pine's Claims

Pine argues that the trial court erred in granting summary judgment in favor of the Appellees because genuine issues of material fact existed and it is the jury's function to determine whether Mrs. Pine's "loss of chance" to survive "was a significant factor in the injury." Appellant's Br. p. 9. Pine claims that he was improperly required to "wholly

7

resolve the significant factor issues as a prerequisite to present [the] case before a jury."

Id.

In a medical malpractice claim, the plaintiff is required to prove the following elements: 1) the physician owed a duty to the plaintiff; 2) the physician breached that duty; and, 3) the breach proximately caused the plaintiff's injuries. Mayhue v. Sparkman, 653 N.E.2d 1384, 1386 (Ind. 1995). An essential element in a negligence action is the requirement of a reasonable connection between the defendant's conduct and the damages that a plaintiff allegedly suffered. Daub v. Daub, 629 N.E.2d 873, 877 (Ind. Ct. App. 1994).

In cases involving an alleged increased risk of harm, the element of causation is examined differently than in a traditional negligence context. In order for the plaintiff to succeed under an increased risk of harm argument, the plaintiff must prove that: (1) the defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position; (2) the harm was, in fact, sustained; and (3) the defendant's negligence was a substantial factor in producing the harm. Mayhue, 653 N.E.2d at 1386.

In Mayhue, our Supreme Court adopted an alternative method of determining causation in a medical malpractice case under a theory of "increased risk of harm," as set forth in the Restatement of Torts:

> One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his

undertaking, if (a) his failure to exercise such care increases the risk of harm. . . .

Id. at 1388 (quoting Restatement (Second) of Torts §323(a) (1965)). Pursuant to Mayhue, once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position and the harm was in fact sustained, "it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." Id. at 1388. When a defendant healthcare provider presents expert medical testimony establishing that the alleged wrongful conduct did not cause the plaintiff's condition or injury, the plaintiff must present expert medical testimony to rebut the lack of causation and demonstrate the existence of a genuine issue as to causation. Morton v. Moss, M.D., 694 N.E.2d 1148, 1152 (Ind. Ct. App. 1998).

Notwithstanding the rule announced in Mayhue, Pine argues that he is not required to present specific evidence quantifying his allegation that Dr. Lee and Indiana Care's alleged negligence caused an increased risk of harm to Mrs. Pine. In support of that proposition, Pine directs us to this court's opinion in Wolfe v. Estate of Custer, 867 N.E.2d 589 (Ind. Ct. App. 2007), which addressed the issue of damages in a medical malpractice case under the theory of increased risk of harm.

In Wolfe, the Custers filed a medical malpractice action against Dr. Wolfe, alleging that he failed to properly treat Custer at a hospital emergency room. Dr. Wolfe alleged that the evidence presented at trial was insufficient to support a finding of

9

malpractice against him because the Custers had failed to prove causation and damages. Id. at 595. More particularly, Dr. Wolfe maintained that the Custers "failed to meet their burden of . . . quantifying the increased risk of harm from which the jury could assess damages." Id.

At trial, the Custers presented testimony from members of the Medical Review Panel who found that Dr. Wolfe had breached the standard of care in treating Custer. Id. at 593. One panel member, Dr. Lackman, testified that Dr. Wolfe was negligent for several reasons, including the failure to properly diagnose Custer, failing to review abdominal x-rays that were taken in the hospital emergency department, and failing to order an immediate surgical consultation. Thus, Dr. Lackman was of the opinion that Dr. Wolfe placed Custer at an increased risk of harm.

Dr. Lackman testified that Dr. Wolfe's negligence triggered a series of events that resulted in Custer's multi-system organ failure and sepsis. Dr. Lackman also testified about some medical literature demonstrating that a delay in a patient's receipt of antibiotics increased the risk for a negative outcome and a higher chance for the continuation of a downward spiral. Id. at 593-94. Based on the medical studies that Dr. Lackman reviewed, the risk of a negative outcome was increased by six to ten percent for each hour that antibiotics were delayed. Id. at 594.

A second panel member, Dr. Hough, also testified that Dr. Wolfe's failure to review the abdominal X-rays, correctly diagnose a small bowel obstruction, or schedule an immediate surgical consultation, put Custer at an increased risk of harm. Id. at 594.

10

Dr. Hough testified that an earlier intervention could have stopped a "cascade" of events from happening to Custer that included multi-system organ failure. Id.

In determining whether the Custers introduced sufficient evidence that related to the quantification of the increased risk of harm, we observed that "evidence of quantification is required in relation to the damages issue in a § 323 case." Id. at 599 n.10. Therefore, a plaintiff must demonstrate an increased risk of harm by expert testimony, and more importantly, produce quantitative evidence expressed in a percentage of increased risk to successfully prove the essential element of damages. Id.

Based on that rationale, it was determined that the Custers met their burden of presenting evidence as to the quantification of the increased risk of harm. Wolfe, 867 N.E.2d at 599. Indeed, Dr. Lackman's testimony of quantitative evidence expressed in a percentage of increased harm aided the jury in determining the amount of damages directly attributable to Dr. Wolfe's conduct and ultimately quantified the harm causally related to Dr. Wolfe's negligence. Id. Therefore, it was determined that the evidence was sufficient to support the jury's verdict.

Unlike the circumstances in Wolfe, the record in this case does not reflect that Pine presented evidence to quantitatively support his position that Dr. Lee's alleged negligence in the misdiagnosis was a substantial factor that contributed to Mrs. Pine's death. As discussed above, Pine's expert, Dr. Griggs, could not provide an opinion as to the extent that Dr. Lee's alleged negligence might have increased Mrs. Pine's risk of death. More specifically, Dr. Griggs testified that:

11

Q. (Mr. Pogue):  Do you believe that there was—there was a problem with the causation as it pertains to Dr. Lee in this case given the timing interval of only six weeks between November 6 and January 22 of 2003?

A (Dr. Griggs):  I don't think there's a problem.  I think the causation is there, but I think the issue is how much difference did it make in terms of loss of chance, loss of life or loss of reasonable existence, those things.

Q:  And that's my question for you is what difference do you think Dr. Lee's failure to diagnose the cancer from November 6th of 2002 until the time it was diagnosed in January 22 of 2003 made to Ms. Pine?

A:  I think it—it prevented her from getting diagnosed in a more—and treated in a more timely fashion, but what percentage of loss of survival I can't—I can't really opine other than . . . what we discussed before.

Appellant's App. p. 78-79.

Dr. Griggs also admitted under oath that he could not "tell a percentage" to which Dr. Lee's conduct might have increased Mrs. Pine's risk of harm.  Id. at 26-27.  He was of the opinion that Mrs. Pine's tumor had existed since May or June 2001in the soft tissues of the spine when she began to experience neck and arm pain.  Id. at 122.

However, Dr. Griggs candidly stated that he would have to defer to a medical oncologist or hematologist for a percentage of increased harm.  Id. at 27.  Moreover, Dr. Griggs agreed that because no autopsy was performed, it was impossible for him to determine precisely where the primary tumor originated.  Thus, he was not able to explain what types of treatment might have been effective.  Finally, Dr. Griggs agreed that Mrs. Pine's prognosis was "grave" and the diagnosis was "nearly 100 percent terminal."  Id. at 124.

In light of this testimony, it is apparent that Pine was not able to provide the essential element of damages in an increased risk of harm setting. In other words, Dr. Griggs could not present specific evidence quantifying his opinion as to the increased risk of harm that was caused by Dr. Lee's alleged negligence.

We also note that in the responses to the requests for admission that were served following Dr. Griggs's deposition, Pine admitted that Dr. Griggs had no opinion as to the percentage of increased harm resulting from Dr. Lee's alleged negligence. Appellant's App. p. 30-32. Indeed, as discussed above, Dr. Griggs testified in his deposition that he would have to defer to an oncologist for a percentage of increased harm. Id. at 52. Therefore, because there was no quantification of a percentage risk that was increased by the Appellees' purported negligence, the jury cannot make that calculation. In short, Pine failed to designate sufficient expert medical testimony to meet his burden in accordance with Trial Rule 56.

Finally, we reject Pine's claim that there was no basis for the grant of summary judgment in Stirling Clinic's favor. Dr. Stirling was voluntarily dismissed from the lawsuit on September 15, 2009, and Pine did not present any expert testimony as to any independent acts of negligence that Stirling Clinic might have committed. Therefore, because Dr. Stirling was dismissed from the lawsuit and no independent claims were asserted against Stirling Clinic, liability cannot attach to it. Comer-Marquardt v. A-1 Glassworks, LLC, 806 N.E.2d 883, 887 (Ind. Ct. App. 2004) (holding that if a servant or agent is released from liability, no liability can attach to the principal).

In sum, while we are sympathetic to the Pines' plight, there were no experts who could give an opinion as to Mrs. Pine's percentage chance of survival as of November 6, 2002. Therefore, because Pine failed to produce quantitative evidence of the risk of harm, his claim fails, and we conclude that the trial court properly entered summary judgment in the Appellees' favor.

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.