**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**LENEIGHA DOWNS**
Monroe County Public Defender
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRUCE FOSTER, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 53A01-1301-CR-36 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Kenneth G. Todd, Judge
Cause No. 53C03-1106-MR-523

**February 20, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BRADFORD, Judge**

# CASE SUMMARY

Appellant-Defendant Bruce Foster had been in a romantic relationship with Angela Holder, but the two were apparently no longer involved when he came to her apartment one morning while she was taking her daughter to school. A neighbor witnessed Foster attempting to break into Holder's apartment with a knife when Holder arrived home. Foster jumped down from the balcony on which he was attempting to gain entry to the apartment and confronted Holder. When Holder attempted to enter the apartment, Foster forced his way in after her and closed the door behind them. The neighbor heard what sounded like six to eight thumps and, shortly thereafter, Foster emerged and left in Holder's car. Eventually, Holder's body was found by her daughter, and it was determined that Holder had been stabbed seven times in the chest and ten times on the extremities. Foster was tried and convicted of murder and auto theft and was found to be a habitual offender. Foster received a sixty-five year sentence, enhanced thirty years by virtue of his habitual offender status.

Foster contends that (1) the State failed to produce sufficient evidence to sustain his murder conviction; (2) the trial court abused its discretion in admitting certain evidence; (3) the trial court abused its discretion in sending Foster's recorded statements to the jury room during deliberations; (4) the trial court abused its discretion in refusing to remove a juror for alleged, implied bias; and (5) Foster's sentence is inappropriately harsh. Because we conclude that Foster's challenges to his conviction are without merit and that his sentence is not inappropriate, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

2

On the morning of June 7, 2011, Holder drove her daughter Anastasia ("Anna") to school. At approximately 9:30 to 10:30 a.m., neighbor A.J. Strole, who knew Foster, witnessed him standing on a balcony and attempting to "jimmy" a second-story window to Holder's apartment with a wooden-handled knife. Tr. p. 95. Foster and Holder had been in a romantic relationship but were apparently no longer involved. When Holder arrived home, Foster dropped down from the balcony and approached Holder as she was walking up to her apartment's door. Foster, who was visibly upset, said, "you dumbass bitch you got me out here doing this stupid ass shit" just as Holder opened the door. Tr. p. 100. Holder gave a large backpack to Foster, who opened it and said, "no bitch this ain't all my shit[,] barged his way in the door[,] turned[,] and locked the door[.]" Tr. p. 101. Strole then heard six to eight "thumps" against the wall. Tr. p. 101. Foster emerged and drove off in Holder's car.

Anna arrived home from school around 3:00 p.m. Anna had forgotten her key and had tried, in vain, to contact Holder via text message and telephone. Anna called her grandmother Sherry Runyon, who soon arrived with her sister. The trio went shopping and while shopping, Runyon received a telephone call from her husband that police had found Holder's purse in Cascades Park at approximately 3:00 p.m. The trio returned to Holder's apartment and secured a key from the manager's office. When Anna unlocked the door, the door would barely open, and, upon looking inside, she saw her mother's body and screamed. Holder had been stabbed seven times in the chest with a single-edged knife, causing her death, in addition to ten times in the extremities. The forensic pathologist determined that Holder died no later than two hours after 10:00 a.m. On June 8, 2011, Foster called

3

Detective William Jeffers of the Bloomington Police Department, and Detective Jeffers recorded the conversation. On June 15, 2011, a knife was found in Cascades Park, and swabs taken from the knife were determined to contain Holder's DNA.

Also on June 8, 2011, the State charged Foster with murder and Class D felony auto theft and alleged that he is a habitual offender. On June 18, 2012, a jury found Foster guilty of auto theft but failed to reach a verdict on the murder count. A second jury trial was held on the murder and habitual offender counts. During the second trial, the State presented evidence based on Foster's mobile telephone records indicating activity on the morning of June 7, 2011, at or near the areas in Cascade Park where Holder's purse and the knife were found. On December 10, 2012, the second jury found Foster guilty of murder and of being a habitual offender. The trial court sentenced Foster to sixty-five years of incarceration for murder (enhanced thirty years by virtue of his habitual offender status) and ordered the sentence to be served consecutively to his three-year sentence for auto theft.

## DISCUSSION AND DECISION

### I. Whether the State Produce Sufficient Evidence to Sustain Foster's Conviction

When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the factfinder's role to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id*. We consider conflicting evidence in the light most favorable to the trial court's ruling. *Id*. We affirm the conviction unless no reasonable fact-finder could find that the elements of the

4

crime were proven beyond a reasonable doubt. *Id.*

The State produced more than sufficient evidence to sustain Foster's murder conviction. Strole testified that he saw Foster attempting to break into Holder's apartment at approximately 9:30 to 10:30 a.m. on the morning in question. Foster, who was in possession of a knife, then argued with Holder before forcing his way into her apartment and closing the door. Soon thereafter, Foster left. The State also presented evidence that Holder died of multiple knife wounds within one to two hours after 10:00 a.m. Moreover, a knife bearing Holder's DNA was later found in Cascades Park, the same park where her purse had been found earlier. Given that the State produced evidence that Foster was at the scene of Holder's murder around the time she died and in possession of a knife, we have little trouble concluding that the State produced sufficient evidence to sustain his murder conviction.

## II. Whether the Trial Court Abused its Discretion in Admitting Certain Evidence

The admissibility of evidence is within the sound discretion of the trial court. *Curley v. State*, 777 N.E.2d 58, 60 (Ind. Ct. App. 2002), *trans. denied.* We will only reverse a trial court's decision on the admissibility of evidence upon a showing of an abuse of that discretion. *Id.* An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the court has misinterpreted the law. *Id.* The Court of Appeals may affirm the trial court's ruling if it is sustainable on any legal basis in the record, even though it was not the reason enunciated by the trial court. *Moore v. State*, 839 N.E.2d 178, 182 (Ind. Ct. App. 2005), *trans. denied.* We do not reweigh the evidence and consider the evidence most favorable to the trial court's

ruling. *Hirshey v. State*, 852 N.E.2d 1008, 1012 (Ind. Ct. App. 2006), *trans. denied*.

## A. Foster's Statement to Police

During trial, the State admitted into evidence and played for the jury a videotape of the June 11, 2011, interview Foster had with Bloomington Police Detective Joe Henry. During the interview, Foster made references to being released from jail recently and smoking marijuana. Before the jury heard the interview, which was admitted as Exhibit 41, the trial court admonished the jury, in part, as follows:

> [L]adies and gentlemen, you are about to see and to listen to an interview of Defendant by Detective Joe Henry of the Bloomington Police Department. During the interview you will hear Defendant say he was in jail shortly before the time period in question, that he was scheduled to appear for a change of plea hearing, and, at another point, that he smoked marijuana. You are advised that such statements are being admitted for the sole purpose of allowing Defendant's statements to be seen and heard in context. Defendant was not in jail as a result of any charge involving violence or a result of any matter related to the allegations in this case. You are instructed that whether Defendant was in jail or facing criminal charges, whether he failed to appear for a scheduled hearing, or whether he smoked marijuana at some point are all matters which are irrelevant and immaterial to the allegations made against him in this case. When you retire to deliberate you shall accord no weight to such matters in determining whether the State has or has not proven the guilt of the defendant beyond a reasonable doubt.

Tr. pp. 564-65.

The jury, however, was specifically and correctly admonished that any admissions made in the statement were irrelevant to the allegations in this case and that it was to give them no weight. "[W]here the trial court adequately admonishes a jury, an admonishment is presumed to cure any error that may have occurred." *Emerson v. State*, 952 N.E.2d 832, 840 (Ind. Ct. App. 2011), *trans. denied*. Foster points to no indication in the record that the jury

6

failed to take the admonition to heart, and our review reveals none. Foster has failed to establish an abuse of discretion in this regard.

Even if we assume that the trial court should have redacted the statement, Foster's argument must still fail. Foster argues that the jury could have used the statements in question to suggest an overall criminality on his part, while the State counters that redacting the admissions would rob the statement of context. Any error the trial court could have made in the admission of the statement, however, can only be considered harmless. Errors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. Ind. Trial Rule 61; *Sparkman v. State*, 722 N.E.2d 1259, 1263 (Ind. Ct. App. 2000). As previously mentioned, an eyewitness placed Foster at the scene of Holder's murder carrying a knife near the time of her death, which is, in our view, overwhelming evidence of Foster's guilt. Any error the trial court may have made in admitting evidence related to Foster's statement can only be considered harmless.

### B. Foster's Mobile Telephone Records

Foster contends that the trial court abused its discretion in admitting his mobile telephone records, which indicated activity in the vicinity of where Holder's purse and the knife were found in Cascades Park. The State argues that the records were admissible pursuant to the "business records" exception to the hearsay rule. At all times relevant to this appeal,[1] Indiana Evidence Rule 803(6) provided for the following exception to the hearsay

---

[1] Effective January 1, 2014, Rule 803(6) now reads as follows:

7

rule:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness.…  A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.  The term "business" as used in this Rule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

But "even records that are not excluded by the hearsay rule must also be otherwise admissible." *Estate of Dyer v. Doyle*, 870 N.E.2d 573, 579 (Ind. Ct. App. 2007) (citing *Wilkinson v. Swafford*, 811 N.E.2d 374, 390 (Ind. Ct. App. 2004), *abrogated on other grounds by Willis v. Westerfield*, 839 N.E.2d 1179 (Ind. 2006)), *trans. denied*.  To be admissible under Rule 803(6), a business record must also be authenticated pursuant to Evidence Rule 901, which provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Evid. R. 901(a).  Thus, to admit business records, "the proponent of the exhibit may authenticate it by calling a witness who has a functional understanding of the record keeping process of the business with respect to the specific entry, transaction, or declaration contained in the document," *Rolland v. State*, 851 N.E.2d 1042,

---

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

….

(6) Records of a Regularly Conducted Activity.  A record of an act, event, condition, opinion, or diagnosis if:

    (A) the record was made at or near the time by--or from information transmitted by-- someone with knowledge;

    (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

    (C) making the record was a regular practice of that activity;

    (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(9) or (10) or with a statute permitting certification; and

    (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

8

1045 (Ind. Ct. App. 2006), or by any other evidence (e.g., an affidavit) sufficient to satisfy the requirements of Rule 901.

*Barrix v. Jackson*, 973 N.E.2d 22, 25 (Ind. Ct. App. 2012), *trans. denied*.

Here, the State satisfied the foundational requirements of Rule 803(6) with respect to Foster's mobile telephone records. AT&T engineer and network performance team manager David Salyer indicated that it is the regular practice for AT&T to compile telephone usage data and that he understood the method by which the data are collected and maintained. Salyers testified that every time an AT&T mobile telephone customer uses his telephone, the device will register on one of AT&T's cellular towers, and a record of that activity will automatically be complied in a nation-side database. Moreover, Salyers explained how to interpret the records, how they are kept, how the information is stored, what the various terms of art in the records meant, how AT&T uses the information, and how cellular towers and zones work. In summary, Salyers's testimony clearly indicated that he possessed the required functional knowledge of how AT&T's mobile telephone records were generated. At the very least, Salyers's testimony gives rise to a reasonable inference that the telephone records offered by the State were, in fact, what they were purported to be. The trial court did not abuse its discretion in this regard.

### III. Whether the Trial Court Abused its Discretion in Allowing Foster's Recorded Statements into the Jury Room During Deliberations

Foster contends that the trial court abused its discretion in allowing the jury to take into deliberations an audio recording of his telephone conversation with Detective Jeffers and a video recording of his interview with Detective Henry.

9

It is well-established precedent in this state that the trial court has considerable discretion in deciding what a jury may appropriately take with it as it begins its deliberations. That discretion is limited by considerations referred to in § 5.1 of the Standards Relating to Trial by Jury (American Bar Association Project on Standards for Criminal Justice), which was adopted by us in *Thomas v. State* (1972), 259 Ind. 537, 289 N.E.2d 508 and which provides:

> 5.1 Materials to jury room.
> (a) the court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions.
> (b) Among the considerations which are appropriate in the exercise of this discretion are:
>> (i) whether the material will aid the jury in a proper consideration of the case;
>> (ii) whether any party will be unduly prejudiced by submission of the material; and
>> (iii) whether the material may be subjected to improper use by the jury.

*Thomas*, 259 Ind. at 540, 289 N.E.2d at 509. *Accord*, *Smith v. State* (1982), Ind., 437 N.E.2d 975, 976-77, *writ of habeas corpus granted on other grounds*, *Smith v. Duckworth*, 910 F.2d 1492 (7th Cir.1990); *Jackson v. State* (1980), 274 Ind. 297, 303-04, 411 N.E.2d 609, 613.

*Powell v. State*, 644 N.E.2d 855, 857 (Ind. 1994).

Foster makes no argument specifically related to the telephone conversation with Detective Jeffers but contends that allowing the jury to view the video of his conversation with Detective Henry only compounded the error of admitting it in the first place. As we have already concluded, however, the trial court properly admonished the jury against improper consideration of Foster's statements, and Foster points to nothing in the record even suggesting that the jury failed to heed the admonition. Because there was no error in allowing the jury to see the video of Foster's interview with Detective Henry during trial, there was no error to compound by allowing the jury to take it into the jury room. The trial

10

court did not abuse its discretion in this regard.

**IV. Whether the Trial Court Abused its Discretion in Declining to Dismiss a Juror**

Foster contends that the trial court abused its discretion in denying his motion to strike juror Melinda Caron from the panel when he challenged her for cause. During voir dire, when Caron was called for questioning, the trial court made the following statement to her: "Ms. Caron, the empty seat at the end of the first row. You're reminded you're still subject to the affirmation I gave you. Feels odd calling you Ms. Caron since we've known each other a long time." Voir Dire Tr. p. 161. Foster challenged Caron for cause based only on the fact that she had "initially responded[ed] that she couldn't be fair based on something she heard in another case[,]" a challenge that was denied. Voir Dire Tr. p. 167.

After the jury had been chosen, Foster's trial counsel questioned Caron further on her relationship with the judicial system:

> [Trial Counsel]: Ms. Caron you're the chief operation manager SASSI Institute substance abuse subtle screening institute inaudible and Mike inaudible is your partner. Is that correct?
> Ms. Caron: Yes.
> [Trial Counsel]: What interaction do you have with the court system?
> Ms. Caron: At this point none.
> [Trial Counsel]: What about Mr. inaudible?
> Ms. Caron: None.
> [Trial Counsel]: This is a private business you run?
> Ms. Caron: It's a private corporation it's not my own. It's a privately owned business that publishes psychological tests and I basically run the company.
> [Trial Counsel]: You said not at this time you don't have a relationship with the Court. Have you had any in the past?
> Ms. Caron: I've had a lot over the years. I've been with the SASSI Institute for fifteen to seventeen years. Before that I ran a social service agency called Amethyst House and before that I was a mental health worker in addictions.

11

[Trial Counsel]: So you've had a lot of interaction with the prosecuting attorney's office?

Ms. Caron: Not really. I really haven't had any direct communication with the prosecutor's office.

[Trial Counsel]: And what about the court system itself?

Ms. Caron: Probation department inaudible.

[Trial Counsel]: Did you formulate any opinions about our system of justice based on your interactions?

Ms. Caron: Well other than I was glad to be able to be a part of it to assist people in the way that I did with alcohol and drug problems.

Voir Dire Tr. pp. 325-27. At the outset of trial, Foster moved to strike the entire jury on the basis of Caron's presence but did not state any additional reasons to support this motion. The trial court denied the motion to strike the panel.

> Article 1, Section 13 of the Indiana Constitution guarantees criminal defendants the right to trial by an impartial jury. The purpose of voir dire is to determine whether potential jurors can render a fair and impartial verdict in accordance with the law and evidence. *Gregory v. State*, 885 N.E.2d 697, 706 (Ind. Ct. App. 2008), *trans. denied*. Such examination is used to discover whether a potential juror has any opinion, belief, or bias which would affect or control his determination of the issues to be tried, providing a basis to exercise the right of challenge either peremptory or for cause. *Id*. Whether a trial court should excuse a particular juror for cause rests within its sound discretion, and we will reverse the trial court only when its decision is illogical or arbitrary. *Fox v. State*, 717 N.E.2d 957, 961 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. We afford substantial deference to trial judges regarding this decision because they see the jurors firsthand and are in a much better position to assess a juror's ability to serve without bias and reach a decision based on the law. *Id*. at 961-62.

*Lindsey v. State*, 916 N.E.2d 230, 236 (Ind. Ct. App. 2009), *trans. denied*.

We need not address the merits of Foster's argument, as he has waived it for appellate review. "It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." *Gill v. State*, 730 N.E.2d 709, 711

12

(Ind. 2000). Foster's entire argument on appeal is based on his allegation that Caron's relationship with the trial judge and/or judicial system rendered her unable to dispense impartial justice and amplified her influence with other jurors, a different basis than the one raised below. Consequently, Foster has waived this issue for appellate review.

## V. Whether Foster's Sentence is Inappropriate

We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State*, 849 N.E.2d 650, 660 (Ind. Ct. App. 2006), *trans. denied* (citations and quotation marks omitted). As previously mentioned, the trial court sentenced Foster to an executed sentence of sixty-five years of incarceration to be enhanced thirty years by virtue of his habitual offender status and to be served consecutive to his previous three-year sentence for auto theft.

The nature of Foster's offense warrants his enhanced sentence. Foster forced his way into Holder's apartment where he stabbed the unarmed Holder no fewer than seventeen times—seven times in the chest and ten times in the extremities—a murder Foster's own forensic witness described as consistent with an act of rage. Moreover, Foster left Holder's body just inside the entrance to her apartment, where he must have known that it was likely

13

to be discovered by a family member, and in fact it was. As for Foster's motive for killing Holder, the record hints at two possibilities, neither one of which even remotely justify his actions. Foster and Holder had been romantically involved at some point, and it seems that, at least in part, Foster went to Holder's apartment the day of Holder's murder to retrieve some of his belongings in a backpack. Foster seems to have been enraged that the backpack given to him by Holder apparently did not contain all of his belongings. The record also contains indications that Foster might have been upset with Holder for seeing another man or men. Foster told Detective Henry that Holder was an "outgoing type girl" and strongly implied that she was sleeping with other men in exchange for drugs. Appellant's App. p. 37. Foster also told detective Henry that when he went to Holder's apartment and found that she was not there, he "thought to [himself], well maybe she's somewhere else where she shouldn't be, that's why she left last night like she did." Appellant's App. p. 36. Either way, nothing in record even remotely justifies or mitigates Foster's brutal murder of Holder.

Foster's character also justifies an enhanced sentence. Although none of Foster's previous crimes measure up in severity to the instant offense, his criminal record is lengthy, with no indications that any of his myriad contacts with the criminal justice system have had the slightest deterrent effect on him. Foster's first criminal conviction was a 1984 conviction for larceny, followed by Class C felony forgery in 1986; Class A misdemeanor battery resulting in bodily injury in 1988; shoplifting in 1989; Class A misdemeanor attempted theft, Class C felony burglary, and Class A misdemeanor criminal mischief in 1990; Class D felony theft in 1991; Class A misdemeanor battery resulting in bodily injury in 1998; Class A

14

misdemeanor domestic battery in 2000; Class C felony fraud on a financial institution in 2002; three counts of Class D felony receiving stolen property in 2006; Class A misdemeanor battery in 2008; Class A misdemeanor theft in 2009; and Class A misdemeanor theft in 2010. Foster has been committed to the Department of Correction on seven previous occasions. Foster has been placed on probation four times and has violated the terms of probation three times, resulting in unsuccessful discharge. In summary, Foster's lengthy criminal history, which has now culminated in a brutal murder, indicates an unwillingness to conform his behavior to societal norms. In light the nature of his offense and his character, Foster has failed to establish that his sentence is inappropriate.

The judgment of the trial court is affirmed.

MATHIAS, J., and PYLE, J., concur.